OLIVER A. BRIDGFORD *et al.*

*v.*

HUMPHREY RIDDELL *et al.*

55   261
31a  412
55   261
41a  632
55   261
147  545
55   261
54a  516
55      261
106a  1205

1. VOLUNTARY CONVEYANCE—*whether fraudulent as to creditors.* It is competent for a party to create a separate estate for his wife out of his own property, if there are no creditors of the husband at the time whose rights will be affected thereby, or even if there are creditors, if the husband retains a sufficient amount to satisfy their claims.

2. The mere fact that such an arrangement is voluntary on the part of the husband, without a valuable consideration, will not authorize a subsequent creditor to question it. If, however, the husband be insolvent, or the conveyance is made with a view to indebtedness to be contracted and with the intent to defraud creditors, it will be fraudulent and void as to them, and any creditor will be authorized to attack it.

3. VOLUNTARY CONVEYANCE—*what constitutes.* Where money belonging to a married woman was reduced to possession by the husband prior to the act of 1861 securing to married women their separate property, it became, under the common law, the absolute property of the husband, and a conveyance of land purchased with such money, to the wife, by the procurement of the husband, even under an agreement originally made between them that the wife's money should be kept and regarded as her separate property, would nevertheless be deemed a purely voluntary conveyance, as regards such creditors of the husband as would have the right to question the transaction on that ground.

4. And in such case the rights of the creditors of the husband would not be affected by the fact that the conveyance to the wife was made after the act of 1861 was in force. The husband having before that time reduced the separate funds of the wife to possession, he could not, after the passage of the act, restore the money so as to make it her separate estate, if the rights of creditors had intervened.

5. SAME—*to what time the equities of the voluntary grantee relate.* Where money belonging to the wife was reduced to possession by the husband prior to the act of 1861, so that it became his absolute property, but, under an agreement with his wife that the money should be set apart for her separate use, it was used in the purchase of land, a bond for the conveyance of which was executed to the wife: *Held,* the equity of the wife would relate back to the time such bond was given, and would be superior to that of a creditor of the husband, whose debt accrued subsequent to that time, though prior to the execution of a deed to the wife.

6.  DEBTOR AND CREDITOR—*when the relation exists—covenants for title.* The relation of debtor and creditor does not exist between a grantor and grantee, in respect to covenants for title contained in the deed, until there has been a breach of such covenants.

APPEAL from the Circuit Court of Mercer county; the Hon. ARTHUR A. SMITH, Judge, presiding.

The opinion states the case.

Mr. B. C. TALIAFERRO and Messrs. FROST & TUNNICLIFFE, for the appellants.

Mr. ISAAC N. BASSETT, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

It is asserted by the complainant, Nancy Bridgford, that she is the owner of certain lands in her own right, described in the bill; that the same have been levied on by virtue of an execution issued on a judgment against her husband, and she seeks to enjoin the sale thereunder on the ground that it will cast a cloud on her title. She claims to have purchased the land with her own separate funds, which, she alleges, were received, in part, from her father, and the residue from her own speculations on the funds so received, during coverture, and from her own personal labor.

The respondent, Riddell, files a cross-bill, and seeks affirmative relief, on the ground that the lands levied upon were purchased with the funds of, and were in fact the property of the judgment debtor, and that he could not convey the lands nor cause the same to be conveyed to his wife to hold as her separate estate, to the injury of his creditors. It is claimed that the several conveyances to Mrs. Bridgford of the lands in question by her husband were mere voluntary conveyances, without consideration, and were made at a time when the

husband was largely in debt, and if the conveyances were not *per se* fraudulent, they were fraudulent in law as to the creditors of the husband.

On the other hand, the complainant, Mrs. Bridgford, insists that if the several conveyances to her are to be regarded as merely voluntary and without consideration, at the date they were so made to her, her husband was entirely solvent, and that every debt he owed at the time of the conveyances or either of them, was subsequently paid. But she further insists that the several conveyances to her were not simply voluntary conveyances ; that the same were founded on a good and valuable consideration ; that the funds with which the lands were purchased of right belonged to her, as her separate estate.

It is not doubted that it is competent for the husband to create a separate estate for his wife out of his own property, if there are no creditors of the husband at the time, whose rights will be put in jeopardy, and even if there are creditors, if the husband retains a sufficient amount to liquidate their claims, it is still lawful. No one can impeach the transaction or inquire into its propriety unless he was a creditor of the husband at the time, and was thereby injured. It has never been held, to our knowledge, that a subsequent creditor can inquire into the fairness of the transaction, even if the conveyances to the wife be regarded as voluntary conveyances, without actual consideration, for the sole purpose of creating a separate estate in the wife. It seems to us that it would be inequitable to hold that a man in his prosperous days could not create a separate estate for the wife, which should be for her maintenance in case disaster should overtake him in his business transactions in later life, and that the estate thus created for the wife would not be beyond the reach of his subsequent creditors. The law not only sanctions such a course, but in many instances it is nothing more than simple justice to the wife. A father, under such circumstances, may make a like provision for his child, and his right to do so has been sanctioned by the highest judicial authority in this country and in England. The doctrine on

264        BRIDGFORD *et al.* v. RIDDELL *et al.*        [Sept. T.,

Opinion of the Court.

these questions has been fully discussed and approved in this court, in the case of *Moritz* v. *Hoffman*, 35 Ill. 553, and need not now be discussed as a new question.

It was held, on the authority of *Van Wyck* v. *Seward*, 6 Paige Ch. 62, that the mere fact of an existing indebtedness does not render a voluntary conveyance absolutely fraudulent and void in law as against creditors whose debts were previously contracted, if there was no intention on the part of the grantor to delay or defraud his creditors, that is, if the grantor has retained a sufficient amount with which to discharge his previous indebtedness. The case of *Moritz* v. *Hoffman* holds the doctrine that before a party can successfully impeach a mere voluntary conveyance to the wife, the party complaining must aver and prove that he was a creditor of the husband at the time, or such circumstances and facts from which the court would be authorized to presume that the husband was insolvent.

The converse of these propositions is, of course, true. If the husband be insolvent, or if the conveyance is made with a view to indebtedness to be contracted and with the intent to defraud creditors, it will be fraudulent and void as to them, and any creditor will be authorized to attack it.

A very large and somewhat conflicting mass of evidence has been preserved in this record. It satisfactorily appears, however, from the evidence, that Mrs. Bridgford did receive some small amount of property from her father, in the State of Indiana, and that by agreement with the husband, she claimed the right, which he conceded to her, to keep it separate from his property, and that the parties did, in good faith, try to carry out this arrangement. They came to Illinois with the wife's money, whatever she may have had, long before the passage of the act of 1861. Some of the funds, claimed to be the wife's, were invested in the name of the husband. Property was bought and sold, and profits realized on it, and Mrs. Bridgford all the while asserting her right to claim it as her separate property. In pursuance of this agreement between the husband and the wife, and for the purpose of carrying it into effect

in good faith between the parties, the first tract of land in con-
troversy was conveyed to Mrs. Bridgford, in 1857. The whole
evidence, without any contradiction, shows that at the date of
that conveyance the husband was perfectly solvent, and no
judgments had then ever been obtained against him. The
debt to respondent, Riddell, had then no existence in any form.
The second conveyance to Mrs. Bridgford was from King, in
1861; the bond for a deed, however, from King to her was
executed in 1859, in pursuance of which the deed was subse-
quently made. The next and last conveyance of the land in
controversy, was from Thompson to Mrs. Bridgford, and was
made in 1864.

Leaving out of consideration for the present, the debt of the
respondent, Riddell, of which we will speak hereafter, we think
the evidence establishes the fact that all the indebtedness exist-
ing against Walter A. Bridgford, the husband of the complain-
ant, Nancy, had been substantially paid before the filing of
this bill, except a judgment in favor of Drury, which, by agree-
ment of parties, was allowed to stand, in consideration of an
agreement to pay an additional rate of interest. Drury is not
now complaining.

We think it may be assumed that the evidence establishes
the further fact that at the dates the several conveyances were
made to Mrs. Bridgford, Walter A. Bridgford was not insol-
vent, but had sufficient means for the payment of all his indebt-
edness, if we except the debt of respondent, Riddell, at the
date of the last conveyance, in 1864.

The history of the claim of the respondent, Riddell, is this:
On the twenty-fifth day of September, 1854, Walter A. Bridg-
ford conveyed to him a farm, in Mercer county, for the sum
of $1800, with covenants of warranty. It appears Riddell was,
by a suit in ejectment in the United States court, on the twenty-
second of October, 1860, and the judgment rendered therein,
evicted from said premises by failure of the title to the land so
made to him by the said Bridgford. Subsequently, on the
eighteenth day of August, 1863, he commenced a suit against

the said Bridgford, in the Mercer county circuit court, and on the twelfth day of October, 1868, he recovered a judgment against him for the sum of $3318. In due time an execution was issued on this judgment, and was by the sheriff levied on the lands in controversy.

. The lands described in the original bill, and claimed by Oliver A. Bridgford, were, at the hearing, by the agreement of the parties, released from the execution, and are not now involved in the controversy. No other creditors are now complaining, and the single question involved, is, whether the several conveyances made at the several times and in the manner herein stated, to Mrs. Bridgford, were, under all the circumstances, fraudulent and void, in fact or in law, as to the respondent, Riddell.

. In view of the evidence, we cannot see how the several conveyances to Mrs. Bridgford can in law be considered otherwise than as mere voluntary conveyances from the husband to the wife; although not made directly by him to her, the deeds were so executed by the procurement of the husband. If it be conceded that the funds with which the lands were purchased were derived from the wife's separate property, originally received from her father, and from the profits arising therefrom, by profitable investments subsequently made, we can not see how that fact would produce a different conclusion. It appears from the evidence, that, although the funds in the first instance, might have belonged to the wife, still the same were reduced to the possession of the husband long before the passage of the act of 1861, and, by the rule of the common law, which prevailed in this State up to that date, became, absolutely, the property of the husband. The evidence discloses the fact that the funds passed through the hands of the husband, and were nearly, if not all, at one time invested in lands in the name of the husband, perhaps without the knowledge or consent of the wife. It is true, those lands, thus purchased, were afterwards sold, and Mrs. Bridgford claimed the proceeds of the same, and her right was conceded by her husband.

It appears that a part of the funds, at least, thus realized from the sale of those lands, was subsequently used. in the purchase of the very lands now in controversy. This fact does not avoid the conclusion that the funds of the wife were reduced to the possession of the husband prior to the act of 1861. The arrangement shown by the evidence to have existed between Mrs. Bridgford and her husband, that her property and money should always be kept separate from his, affords a sufficient moral consideration, at least, for the several conveyances to her, and divests the whole transaction of any fraudulent intent in fact. If the rights of no creditors are imperiled thereby, the transaction was not unlawful, and was for a legitimate purpose. The whole question involved, therefore, is reduced to the single inquiry whether the several conveyances in this instance, if the same shall be regarded as merely voluntary conveyances, by or at the request of the husband, for the benefit of the wife, were fraudulent in law as to the complaining creditor, Riddell.

In regard to the tract of land conveyed by the deed of the date of May 9, 1857, by Oliver A. Bridgford, to Mrs. Bridgford, we think there can be no serious question, on the evidence in this case. It is manifest that it was conveyed to her for the reason that her husband recognized her equitable right to the funds with which it was purchased. The whole evidence shows that it was conveyed to her at a time when her husband was in good circumstances, when there were no judgments against him, and no creditors whose rights would be delayed. The conveyance was made for a lawful and most equitable purpose, and was made long before the complaining creditor's claim, which he now asserts, had any existence in any form, and before it could have been anticipated that a cause of action would arise thereon. The evidence further shows that at the date of this first conveyance, Walter A. Bridgford was entirely solvent, and he was therefore at liberty to do justice to his wife by having the property, which he conceded had been purchased with money that equitably belonged to her, conveyed to her,

for and as her separate estate, and it is not in the power of any subsequent creditor of the husband to impeach the fairness of that transaction. To permit him to do so now, after the lapse of so many years, would be a flagrant violation of the plainest principles of law and justice.

The serious controversy, however, arises on her right to the tracts of land conveyed to her by the deed from King, in 1861, and from Thompson, in 1864, by the direction of the husband; and here we are met with conflicting equities between the complainant, Mrs. Bridgford, and the respondent, Riddell, and the question is, which shall prevail? This leads us to inquire into the exact dates at which the equities of the respective parties attached. The conveyance from King to Mrs. Bridgford was not in fact executed until the 17th day of July, 1861, but the bond, in pursuance of which the deed was subsequently made, was executed in 1859, and a large part of the purchase money was paid as early as May, of that year. Did her equities in that tract of land relate back to the date of that bond? It may be fairly assumed that the proof establishes the fact that this tract of land was purchased with funds that the husband had set apart as equitably belonging to the wife. Certainly, all that was paid in the year 1859 was of that character of funds. If her equities do relate back to the date of the bond in 1859, was the respondent, Riddell, at that date a creditor of her husband, Walter A. Bridgford?

We have already spoken of the nature and origin of the claim of the creditor, Riddell, against Walter A. Bridgford. When could it be said to have assumed the nature of indebtedness between the parties? Riddell was not evicted from the premises conveyed to him by Bridgford, until the year 1860, and did not commence his suit on the covenants of the deed until 1863, and never succeeded in obtaining a judgment until 1868.

We are unable to discover any evidence whatever, that Walter A. Bridgford knew or had any reason to suspect that the title of the premises conveyed to Riddell had failed, or was

even questioned, until after the termination of the suit in eject-
ment adversely to him. Can it be fairly said that any indebt-
edness existed between the parties until the breach of the cove-
nants of the deed, or will the date of the indebtedness be referred
back to the date of the covenants? We do not understand
how it can be said that any indebtedness could exist between
the parties until there was a breach of the covenants, something
on which Riddell could found an action, claim or demand.
Previous to that time, he had no cause of action whatever, in
law or equity.

It is insisted by the appellee that after the breach of the cove-
nants and the action had accrued, the date of the indebted-
ness will be referred back to the date of the covenants, which
was in 1854, and we have been referred to the case of *Choteau*
v. *Jones et al.* 11 Ill. 300, as supporting that view of the law.
We do not understand that case to support the views of the
counsel for appellee. That case simply holds that where a party
is security for another, such relation of debtor and creditor
exists between the parties from the date of the obligation, as
will enable the surety to avoid a mere voluntary conveyance
made by the principal, and on that question it certainly states
a correct principle of law. We cannot assimilate the case under
consideration to the principle established by that case. We
are unable to perceive the analogy between the two cases. In
the former case there was a continuing liability between the
parties, and in the present one there could be no demand or
action until a breach of the covenants by eviction. We must
therefore hold that the relation of debtor and creditor did not
exist between Walter A. Bridgford and the respondent, Riddell,
until a breach of the covenants, by eviction, in 1860. Cer-
tainly not prior to that time.

Who, then, had the prior equities? In 1859, when the bond
was executed by King to Mrs. Bridgford, and the money set
aside by the husband as equitably belonging to the wife, with
which to pay for the land, it could not have been to the preju-
dice of Riddell, for the relation of debtor and creditor did not

then exist. The wife's interest having attached to the land before the creditor, Riddell, was in a position to question the conveyance, her prior equities can not and ought not to be postponed to his equities, whatever they may be. The rule is general, that he that hath the prior equity shall prevail. We cannot doubt that the tract of land in controversy was purchased from King, with moneys which equitably belonged to the complainant, and that she acquired her interest therein before the relation of debtor and creditor existed between her husband and Riddell. It has always been the favorite policy of a court of chancery to protect the equitable estate of the wife, when it can be done consistently as between her and her husband and his creditors. The respondent, Riddell, is now asking affirmative relief in a court of equity, and he cannot be heard to insist that the inflexible and sometimes harsh rules of the common law shall be strictly enforced against a married woman. If he insists upon having the strict rules of the common law enforced, he must do so only in a court of law. A party in a court of equity, who asks to have his own equitable rights enforced, and contracts annulled which he insists are unconscionable and fraudulent, must by clear and indubitable evidence, show that he has superior equity to all against whom he seeks relief. If he invokes the aid of this tribunal he must not ask to have superior equity set aside to let him in to the relief sought.

Mr. Justice STORY, in commenting on the rights of married women, says "it is well known that the strict rules of the old common law would not permit the wife to take or enjoy any real or personal estate from or independent of her husband, and although these rules have been in some degree relaxed and modified in modern times, yet they still have a very extensive and comprehensive influence in courts of law. On the other hand, courts of equity have, for a great length of time, admitted the doctrine that a married woman is capable of taking real and personal property to her own separate and exclusive use, and that she has also an incidental power to dispose of it." 2 Story Eq. Juris. sec. 1378.

In *Sweeney* v. *Damron*, 47 Ill. 450, this court said, "where a husband has received funds belonging to the wife and invested them for her in her name, or has the property subsequently conveyed to her, courts of equity will treat the transaction as fair, and will sustain it as against subsequent creditors. In such a case her equity is equal, if not superior, and, having the legal title, it will not be disturbed."

The case proceeds on the doctrine that in such a case, the wife has equal if not superior equities to the creditor, and the courts will afford protection. Any other rule would require the superior equity to give way to that which is inferior.

The rights of Riddell, in this instance, accrued after the equities of complainant attached on the bond of 1859, and the deed made in pursuance thereof, in 1861, must be held to relate back to that date. The complainant, having added to her equitable title, the legal title to the tract of land, the court will not now disturb it.

We come now to consider the last tract of land involved in this controversy, viz: the tract conveyed to Mrs. Bridgford by Thompson, in 1864. We find that on the ninth day of May, 1857, Walter A. and Oliver A. Bridgford jointly owned the northwest quarter of section ten, and on that day, Oliver, for a valuable consideration, conveyed his undivided half to Mrs. Bridgford, which placed the legal title to the whole quarter section in Walter A. and Nancy Bridgford. It appears that subsequently, by a parol agreement between the parties, they divided the said northwest quarter, and Walter A. took the west half and Nancy took the east half.

In 1857 the west half of the northwest quarter of section ten was levied on by virtue of an execution issued on a judgment in favor of George O. Thompson *et al.* and was purchased at the sheriff's sale by George O. Thompson, and a deed was executed to him by the sheriff in 1860. This is the tract of land conveyed to Mrs. Bridgford in 1864. In 1865 the complainant and Walter A. Bridgford conveyed the south half of the northwest quarter of section ten, to Oliver A. Bridgford.

The lands claimed by Oliver in his own right having been released from the levy, there only remains the north half of the west half of said quarter, involved in this controversy.

Regarding these conveyances in law as voluntary conveyances, although made with no fraudulent intent in fact, nevertheless, the conveyance was made to the complainant at the request of her husband, after the relation of debtor and creditor existed between him and the respondent, Riddell. It must, therefore, be held to be fraudulent, in law, as to the creditor. It falls clearly within the rule that the husband, while insolvent, cannot create a separate estate for the benefit of the wife. It does not change the result that this last conveyance was made after the passage of the act of 1861. Whatever funds the complainant may have had in her own right, had previously been reduced to the possession of the husband, except such as she claimed to have derived from her own labor and enterprise. The rule of the common law then prevailed, and the earnings of the wife, whatever they may have been, enured to the benefit of the husband as his absolute property. Having, previous to the passage of the act of 1861, reduced the separate funds of the wife to possession, the husband could not, after the passage of that act, restore the money, so as to make it separate estate, to the wife, if the rights of creditors had intervened.

It is insisted that Walter A. Bridgford has a life estate in the lands in controversy, as tenant by the curtesy, that is liable to sale on execution. It is not necessary to discuss that question at this time, for the reason that it is not presented by the pleadings and proof.

After a careful consideration of the entire record, we are of opinion that that part of the decree which finds by the stipulation of the parties that all the lands levied on and described by the original bill have been released from the levy, except the north half of the northwest quarter of section ten, and the south half of the southwest quarter of section three, town fourteen, north of range four, west, be affirmed, and that the remainder of the decree of the circuit court be reversed, and the cause

remanded, with directions to the court to enter a decree dismissing the cross bill as to all the lands except the north half of the northwest quarter of section ten, town fourteen, north of range four, west, and as to this last tract of land, to decree as in the former decree, and further, to enter a decree on the original bill perpetually enjoining the sale of the remainder of the land described in the bill, and claimed by the complainant Nancy Bridgford.

The costs in this court will all be adjudged against the appellees. The decree is reversed in part, and the cause remanded.

*Decree reversed in part.*