## GRAVES *v.* DAVENPORT *et al.*

*(District Court, N. D. Illinois.* June 8, 1892.)

1. WITNESSES—CREDIBILITY—ADVERSE PARTY AS WITNESS.
   A complainant who has called defendants as his witnesses is bound by what they say, and cannot ask the court to disbelieve them, or to infer that they have testified falsely.

2. HUSBAND AND WIFE—PROMISSORY NOTE—CONSIDERATION.
   A wife gave to her husband $1,100 inherited by her, with which he bought a farm. He afterwards sold the farm, and with the proceeds bought another farm. When he wished to sell the second farm his wife refused to join in the deed unless some provision was made for her money, which he had had for 18 years, whereupon he gave her his note for $3,000. *Held,* that the note was given for a good consideration.

3. PARENT AND CHILD—COMPENSATION FOR SERVICES.
   Where a son works faithfully for his father on a farm for 10 years after his majority, his services are a good consideration for the father's promise to pay him $5,042.

4. FRAUDULENT CONVEYANCES—EVIDENCE—CONSPIRACY.

    In part consideration of a conveyance by a father to his son, the son agreed to assume and pay a debt due to his mother. He thereupon mortgaged his land to his mother's brother for the necessary amount, receiving from the brother a check on a bank, in which were no funds to pay it. The check was given to the mother in payment of her claim, and she afterwards exchanged it for her brother's note. The father was at the time bankrupt, but the other parties had no knowledge of that fact. *Held*, that the way in which the debt was paid was not sufficient to show a conspiracy to defraud the father's creditors.

    In Equity. Bill by Amos C. Graves, assignee in bankruptcy of Theron Davenport, against Josephus Davenport, Deborah Davenport, and Coe Swartout, to set aside certain conveyances on the ground of fraud.

    *Charles Wheaton,* for complainant.

    *H. H. Cody* and *Mark Bangs,* for defendants.

    BLODGETT, District Judge. This is a bill in equity by the assignee of Theron Davenport, a bankrupt, seeking to set aside certain conveyances of real and personal property made by the bankrupt to the defendants Josephus Davenport and Deborah Davenport, on or about the 6th day of November, 1877. It appears from the proof that on the 6th day of November, 1877, the said Theron Davenport, who was then, in fact, insolvent, made to his son, the defendant Josephus Davenport, a conveyance of a farm situated in Kane county, Ill., containing about 348 acres of land, for the nominal or expressed sum of $13,928, and that he also at the same time, made to the said Josephus a bill of sale of most of the live stock and farming implements upon said farm, for the expressed consideration of $3,800. The assignee seeks by this bill to set aside this conveyance, on the ground that it was fraudulent as against the creditors of Theron Davenport, the bankrupt.

    The evidence in the case is meager, in many respects fragmentary, but the following facts may be said to be clearly established by it: The bankrupt, Theron Davenport, had been, for several years prior to the transfer in question, in possession of the farm. His son, Josephus, who at the time of the transfer was about 32 years old, had resided with him from the time he reached his majority, had devoted himself faithfully to managing and conducting the affairs of the farm, with no special understanding between himself and his father as to the amount which he was to receive for his services, except that the father had frequently assured Josephus that he would do well by him if he would stay with him and carry on the farm. For 10 or 12 years before the transaction the bankrupt, Theron Davenport, had been engaged in buying and selling cattle, and trading in live stock generally, having given but little, if any, attention to the affairs of his farm. He was in good credit, and generally reputed and believed to be a man of ample means. But for some time before the transfer of the farm to Josephus, Josephus had been importunate to have the amount which was due him, or which he was to receive for his services, determined, and for a settlement with his father; but his applications in that regard had been deferred and postponed by the

father by one excuse and another until finally, just previous to the transfer, he proposed to Josephus to convey to him the farm, which was then subject to a mortgage of $3,000, in full satisfaction of what he owed Josephus for his services, which they had adjusted a few days previously at $5,042, and that he, Josephus, should pay enough money to liquidate and pay a claim which was held by the defendant Deborah Davenport, the wife of the bankrupt, against her husband, amounting, including interest, to $5,885.83, and that he would assume and pay the $3,000 incumbrance upon the farm; thus making the purchase price for the farm, as above stated, $13,927.83, which was equivalent to about $40 per acre for the land. At the same time the bankrupt made a bill of sale to the defendant Josephus of most of the live stock and farm implements upon the farm, the consideration for which was an agreement on the part of Josephus to pay certain indebtedness of his father's, for which he, Josephus, was holden as surety, amounting to $3,800.

The bankrupt law, as it stood at the time of this transaction, required that, in order to entitle the assignee to recover back any payments or property transferred on the ground that it was a fraudulent preference or a fraudulent transfer, the person receiving the preference or transfer should know that the grantor was insolvent, and that the conveyance or payment was made in fraud of the provisions of the bankrupt act.

In support of the allegations of the bill the complainant relies mainly upon the testimony of the bankrupt and the two defendants Josephus and Deborah Davenport. He has called upon them to testify, and made them his witnesses in that behalf. The defendant Josephus testifies that he did not know at the time he received this property that his father was insolvent, or that he owed any other debts than those which were canceled or provided for under this transaction. That he supposed that by this transaction his father virtually provided for the payment of all his indebtedness; that his father kept no books, and that he was not aware that he was involved in debt. The defendant Deborah Davenport testifies that she did not know that her husband was involved in debt. She supposed that all the indebtedness he had was what he owed to herself and her son, and she had no idea of any other indebtedness. She was laboring under the belief that he was in prosperous and independent circumstances, aside from his interest in the farm. This testimony is attacked by the complainant's counsel upon the ground that it is improbable and incredible that these two witnesses, bearing the close relation they did to the bankrupt, should not have known more about his affairs than they testified they actually did. I do not think, in the light of the testimony of these witnesses, that their ignorance in regard to the extent to which he was involved in debt is improbable, or unworthy of belief. The bankrupt was a trader, engaged in the buying and selling of live stock away from his farm, kept no books to which either his wife or his son had access, and made no disclosures, as the proof shows, to them of his financial condition.

The son was employed upon the farm, took no part in the dealing in live stock by his father, and had no occasion, therefore, to become familiar with the financial condition of his father growing out of his dealings. There is no presumption that the bankrupt disclosed his financial condition to his wife, and nothing in the record contradicts her denial of the fact that she did not know of his insolvency. The only testimony which complainant has introduced, aside from that of the defendants Josephus and Deborah, which tends to charge either of them with any knowledge of the insolvency of the bankrupt, is that of one Farren, who testified to a conversation had with Josephus about the time of the adjudication of bankruptcy, in which Josephus said, or in which he says that Josephus stated, that his father had been insolvent three or four years. This witness is wholly contradicted by Josephus Davenport, and, with the improbability of his having made such a statement to a comparatively entire stranger, I am inclined to believe that Davenport's statement is true. Aside from this, however, this testimony of Farren, it seems to me, should be excluded from the consideration of the court on the ground that this complainant, having called Josephus Davenport to testify, cannot be allowed to impeach his testimony. In this connection I may also add that the complainant, having called both Josephus and Deborah to testify in the case, and presented them as reliable witnesses, is bound by what they say, and cannot ask the court to disbelieve them, or to infer that they have testified falsely, and that they must have had, as is insisted by complainant, actual knowledge of Theron Davenport's insolvency. I am therefore quite clear that the complainant has failed to prove that either of these defendants knew of the insolvency of Theron Davenport at the time they received payment in full upon their respective demands against him.

The complainant insists further, however, in regard to this feature of the case, that the bankrupt was not indebted to his wife, Deborah Davenport, and that, therefore, the payment to her was fraudulent. The proof shows that soon after the marriage of Theron and Deborah Davenport she received from her grandfather's estate about the sum of $1,100, which she gave over to her husband, to be used in the purchase of a farm. This occurred about 1850. A farm was purchased, and after about 10 years it was sold, and with the proceeds another farm was purchased. After a few years Theron Davenport wished to sell the second farm, and his wife then declined to sign a deed releasing her dower and homestead right in that farm, unless some provision was made for her money, as she called it, which had been invested in the original farm; and at that time, as the consideration of her signing the deed of the second farm, he gave her a note for $3,000, which represented the original $1,100, and about 18 years' interest. The farm now in question was purchased with the proceeds of the second farm, and Mrs. Davenport had continued to hold this note, which, by its terms, was due one day after date, and drew interest at the rate of 10 per cent. per annum until the transaction between her husband and son on the 6th of November. In the light of the Illinois authorities, I

think this note was given upon a good consideration, as between Mr. and Mrs. Davenport. He had had her money, and there was an obligation on his part to recognize her right to a substantial interest in the property which had grown up from the investment of her money. So that when she demanded a recognition of her right in 1868, at the time the second farm was sold, I have no doubt that it was entirely competent for him to do so, and made the note for $3,000 to his wife a good and binding obligation. The Illinois cases referred to are *McLaurie* v. *Partlow*, 53 Ill. 341; *Bridgford* v. *Riddell*, 55 Ill. 261. But aside from this, the proof also shows that she declined to sign the deed for the second farm, and release her dower and homestead rights, except on condition that he should give her this note, and that, of itself, would make a sufficient consideration. *Yazel* v. *Palmer*, 81 Ill. 83; *Medsker* v. *Bonebrake*, 108 U. S. 66, 2 Sup. Ct. Rep. 351.

It is also contended that nothing was due from the bankrupt to his son, Josephus, at the time of the sale of the farm, and that, therefore, the pretended allowance of $5,042 on the purchase money for Josephus' service was fraudulent. I think, however, the proof shows that the son had rendered faithful and meritorious service for his father for upwards of 10 years; that the amount agreed upon between himself and the father was not extravagant, under the circumstances, and shows no evidence of a fraudulent intent.

Much is said in the briefs and argument of counsel for the complainant in regard to the way in which the claim of Mrs. Davenport was paid. The proof shows that Josephus understood when he agreed to take the farm on the terms proposed by his father that he was to raise money enough to settle the claim of his mother against his father; that his expectation was to raise this money by a mortgage upon the farm, and he had started for Aurora to make negotiations for that purpose, when he met the defendant, Coe Swartout, and on mentioning to Swartout the purpose of his visit to Aurora, Swartout at once proposed to loan the money necessary to pay the debt to Mrs. Davenport, and take a mortgage upon the farm. Swartout is the brother of Mrs. Davenport, and, as the proof shows, was reputed and believed, both by Mrs. Davenport and Josephus, to be a man of quite independent means, a farmer residing in Seneca county, N. Y., with means to the extent of $30,000 or over. Josephus accepted this proposition made by Swartout, and a mortgage was made to Swartout upon the farm to secure the sum of $5,885.83, being the amount due Mrs. Davenport from her husband, and Josephus received from Swartout $1,400 in money, and a check upon a bank in Ovid, Seneca county, N. Y., for $4,485.83. Josephus then passed over to his father, Theron, the check and the money he had received from Swartout, and Theron delivered them to his wife, and took up his note. Subsequently an arrangement was made between Swartout and Mrs. Davenport by which she surrendered the check to him, and took his note for the $4,485.83, payable six years after date, with interest at 8 per cent. per annum. The complainant has introduced testimony tending to prove that Swartout was not a money lender, and had no

money in the bank on which this check was drawn, and not sufficient means at hand with which to have made good the check at the bank. This question has, however, it seems to me, become wholly immaterial, and is really eliminated from the controversy by the fact that the check was surrendered, and Mrs. Davenport took in lieu thereof the note of Swartout, with which she was entirely satisfied. It is insisted on the part of the complainant that, taken altogether, the transaction between the bankrupt and his wife and son, and the transaction between the son and Swartout, and Swartout and Mrs. Davenport, shows a conspiracy on the part of these parties to defraud the creditors of Theron Davenport. It is sufficient, however, I think, to say that these parties, who have been examined as witnesses, all deny any such conspiracy, deny that they knew there were any creditors to be defrauded, and deny any bad faith in any of the transactions which are attacked by the bill. And whatever may have been the purpose of Theron Davenport in making the conveyance to his son, the case, as I have already said, entirely lacks proof of any knowledge on the part of the son or wife of a fraudulent intent on the part of the bankrupt. With regard to the sale of the personal property by the bankrupt to Josephus, the evidence is clear, and I may say undisputed, that Josephus was responsible as surety on his father's paper for the full amount of $3,800; that the property probably would not have sold for more than that amount, and it is doubtful, I think, if it would have brought the amount for which Josephus was liable. He agreed to take the property and pay these debts, as he supposed, thereby relieving his father from all indebtedness, and he has paid the debts as he agreed. The transaction does not, as it seems to me, show any evidence of fraudulent intent, so long as there is no proof of any knowledge of the father's insolvency. For these reasons I am of opinion that the complainant has not made out a case by the proof which entitles him to have this conveyance set aside, and that the bill should be dismissed for want of equity.