CHOCTAW & M. R. CO. et al. v. NEWTON et al.

(Circuit Court of Appeals, Eighth Circuit.   July 31, 1905.)

No. 2,001.

1. CONTRACT FOR RAILROAD CONSTRUCTION—PROVISION MAKING ENGINEER UMPIRE.

A contractor for railroad construction work, who has voluntarily stipulated in the contract that the chief engineer of the railroad company shall act as umpire, to finally decide all questions arising as to the construction of the contract, the nature and character of the work required or done, the classification of materials excavated, and all other questions in respect to which there might be dispute or misunderstanding, cannot impeach the decision of such engineer and recover an amount in excess of that shown thereby to be due, except on a clear showing of fraud, or of such an arbitrary and wanton disregard of his plain rights as to be the equivalent of fraud and to show that the umpire's action was consciously unjust. A direction to a master that, to warrant a finding of fraud in such decision, the evidence must be "reasonably convincing," does not come up to the measure of proof required.

2. SAME—EVIDENCE CONSIDERED.

Conflicting testimony with respect to the amount and proper classification of work done by railroad contractors in the construction of a roadbed considered, and *held* insufficient to support a finding that the chief engineer, who was made by the contract the final arbiter in such matters, acted fraudulently or corruptly in making his final estimates, so as to warrant the court in setting aside or increasing such estimates.

3. EVIDENCE—PRESUMPTION FROM FAILURE TO PRODUCE.

The failure of a party to produce testimony within his knowledge and power on a material question involved in the case raises a presumption that the fact is against him.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 95, 97.]

4. WITNESSES—IMPEACHMENT BY PARTY PRODUCING.

A party cannot impugn the integrity of witnesses introduced by himself and on a part of whose testimony he relies.

Sanborn, Circuit Judge, dissenting.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, § 1094.]

Appeal from the Circuit Court of the United States for the Eastern District of Arkansas.

On November 29, 1898, the Choctaw & Memphis Railroad Company entered into a contract with the Choctaw Construction Company for the acquisition of a line of railroad between the Mississippi river and Little Rock, in the state of Arkansas, and to construct a railroad from the western terminus of the Little Rock & Memphis Railroad to the western boundary of the state. On November 30, 1898, the Choctaw Construction Company entered into a contract with McCarthy & Reichardt for the construction of about 65 miles of this road, a small part of which work was sublet to the Magoon Construction Company. The important provisions of which contract, in so far as they are essential, are as follows:

"(1) Said work shall be finished in the best and most workmanlike manner, and shall be constructed of the best materials of their several kinds, and all in conformity with the annexed specifications, and conditions, and proposals, which are hereby expressly made a part of this contract."

"(3) The contractor takes the work solely upon his own information and judgment of the character of the country and the location and amount of the various kinds of materials to be encountered, and without reliance upon the profile and preliminary approximate estimates of the chief engineer of the company.

140 F.—15

"(4) The accepted tender of the contractor, the specifications for the doing of the work, and the several parts of this contract shall be taken and construed together, and, if it be found that anything has been omitted or misstated which is necessary for the proper performance and completion of any part of the work contracted for, the contractor will, at his own expense, execute the same as if it had been inserted or properly described herein, as the case may be; and the decision of the chief engineer of the company shall be final as to any such error or omission, and the correction of any such error or omission shall not be deemed to be an addition to or deviation from the work hereby contracted for.

"(5) The chief engineer of the company shall be at liberty at any time, either before or during the construction of the work, or any portion thereof, to order any additional work to be done, and to make any changes in the work contracted for, or in its location or position, either in line or grade, which he may deem expedient, whether such changes increase or diminish the work to be done or the cost of doing the same. All the terms and provisions of this contract shall apply to all such changes, additions, or deviations in like manner and to the same extent as to the work originally contracted for, and no changes, additions, or deviations shall annul or invalidate this contract. Such changes, additions, or deviations shall not affect the prices herein specified; nor shall any bill for 'extras' or other charge or claim be made, allowed, or paid by reason thereof, or any difference occasioned by any such change or alteration in the quantity, quality, location, or nature of the work to be performed.

"(6) Whenever work is required to be done which is not covered by the prices herein mentioned, the chief engineer of the company shall give a written order for the doing of such work, and fix the prices to be paid for the doing of the same. The obtaining of the certificate of the chief engineer of the company as to the work done and the price thereof shall be a condition precedent to the right of the contractor, to be paid for any such extra work. Nothing shall be deemed extra work, however, which can be measured or estimated under the provisions of this contract. All claims for extra work or material must be presented to the chief engineer of the company for allowance at the close of the month in which it was done or furnished, to be included in the estimate for that month; otherwise, all claims therefor shall be deemed absolutely waived by the contractor, and the company shall not be required to allow or pay for the same."

"(15) All imperfect or insufficient work or material, when pointed out by the chief engineer of the company, shall be immediately remedied and made good and sufficient by the contractor, at his own cost and expense, to the satisfaction of said chief engineer, and any omission by the said chief engineer to disapprove of or reject any insufficient or imperfect work or material at the time of any monthly or other estimate, shall not be deemed an acceptance of such work or material; and the said chief engineer shall have the power to have any defective work and material taken out and rebuilt or replaced at any time at the expense of the contractor."

Paragraph 16 fixes the prices to be paid for the several kinds of work. The prices for excavation were as follows: Earth, 13 cents per cubic yard; loose rock, 33 cents per cubic yard; solid rock, 60 cents per cubic yard. "And it is mutually agreed between the parties hereto that all the material excavated by the contractor under this contract shall be classified either as earth, loose rock, or solid rock, and that the chief engineer of the company shall determine how all excavated materials shall be classified, and in all cases of dispute his finding or decision in the premises shall be conclusive on both the parties hereto.

"(17) Approximate estimates of the work done under this contract are to be made at the end of each calendar month by the chief engineer of the company, and payments thereon are to be made by the company to the contractor on or about the 20th day of the next ensuing month, less all previous payments, and less 10 per cent. of the amount of each and every monthly estimate, which percentage shall be retained by the company until the complete performance of this contract by the contractor. The approximate estimate

made from month to month shall not in any respect be taken as an admission by the company of the work done, or of its quality or sufficiency, or of the amount due the contractor, nor as an acceptance of the work or release of the contractor from responsibility in respect thereof; but, at the time of the making of the final estimate, the whole of the work and all of the particulars relating thereto, including quantity, quality, and price, shall be subject to revision and adjustment by the chief engineer of the company. The company shall not be liable for any errors or omissions in said approximate monthly estimates, nor for any loss or damage suffered by the contractor by reason of his having settled with his subcontractors on the faith thereof, or otherwise."

"(23) Before final settlement is made between the parties hereto for work done and materials furnished under this contract, and before any right of action shall accrue to the contractor against the company therefor, the said contractor shall furnish evidence satisfactory to the chief engineer of the company that the work covered by this contract is free and clear from all liens for labor or materials, and that no claim then exists against the same for which any lien could be enforced.

"(24) Whenever, in the opinion of the chief engineer of the company, this contract and all things herein agreed to be done by the contractors shall have been completely performed and finished according to the provisions hereof, and within the time herein limited, said chief engineer shall make and return a final estimate of the work done and materials furnished by the contractor under this contract, together with a statement of the amount due to him therefor and remaining unpaid, and shall certify the same in writing under his hand, and the company shall, within —————— days after the completion of the work aforesaid and the return of said final estimate, pay to the contractor the full amount so found to be due to him and remaining unpaid, including the percentage retained on former estimates as aforesaid, except as in this contract is otherwise provided. The procuring of such certificate and final estimate shall constitute a condition precedent to any right of action by the contractor against the company. Before final payment shall be required to be made by the company under this contract, the contractor shall acknowledge and deliver under his hand and seal a release and discharge of and from any and all claims and demands for and in respect of all matters and things growing out of or connected with this contract, or the subject-matter thereof, and of or from all claims and demands whatsoever.

"(25) It is hereby mutually covenanted and agreed by and between the said parties hereto that to prevent disputes or misunderstandings between them in relation to any of the stipulations and provisions contained in this agreement, or the true intent and meaning thereof and of the specifications hereunto annexed, and of the plans, profiles, and drawings relating thereto, or the matter of performance of said contract by either of said parties, and for the speedy settlement of such as may occur, the chief engineer of the company, who may be such at the time of the making of the final estimate, shall be, and he is hereby, made, constituted and appointed the umpire to finally decide all such questions and matters; and he shall also determine, and set forth in the final estimate, the amount and quantity, character, kind, and classification of all work and materials performed and furnished by the contractor under this contract, including all extra work and material, and his decision and determination as to any and all such questions, matters, and things, and in construing any of the terms and provisions of this contract shall have the force and effect of an award, and shall be final, binding, and conclusive, to all intents and purposes, and in all places, upon the said parties hereto. And the contractor hereby waives all objections to the appointment of said chief engineer as umpire by reason of his being a stockholder, director, or officer of the company. And the chief engineer of the company, who may be such at any time during the performance of this contract, is hereby expressly authorized by the company to appoint all necessary assistant, resident, and division engineers and other agents to represent him upon the work, or in and about the same, and to vest in them, or any or either of them, any or all of the powers conferred upon him herein or in the annexed specifications; and all directions given by assistant engineers, inspectors, or other persons appointed by the chief engineer during the construction of the work covered by this contract must be as fully

and explicitly carried out as if directed by the chief engineer personally. Said chief engineer may take final action as umpire upon any and all questions, matters, and things arising under this contract, upon the reports and statements of said assistant, resident, and division engineers or other agents, without notice to the parties hereto or personal inspection of the work, and all of his acts in the premises shall be final and conclusive and binding upon the parties to this contract.

"(26) It is finally covenanted and agreed by and between the parties hereto, for themselves, their subcontractors, executors, administrators, successors, and assigns, that this contract and all of its terms and provisions shall be binding upon them, and each and every one of them, and that the work covered by this contract, and all money due thereunder, shall be free from and not liable to any lien or charge at law or in equity, or under the mechanic's lien act of any state, territory, or country.

### General Specifications.

"(1) Graduation. All work shall be done in a neat and workmanlike manner, and under the supervision of the engineer in charge, and subject to the following general specifications: The right to change at any time the alignment or adjustment of the grades of the road, to increase or diminish the width of cuts and embankments, or change their slopes, is reserved to the engineer in charge, and it is understood that no claim for damages will be made or allowed because of such changes.

"Grading. Grading shall include all excavations and embankments required for the formation of the roadbed, depot grounds, and necessary turnouts, changing direction of streams, cutting down or raising up any highway or private road, foundation pits, and all other excavations and embankments in any way connected with or incident to the construction of the railway."

"(5) Excavation in Rock. Excavations in rock shall be taken out 18 or 20 feet base, with slopes of one-quarter ($\frac{1}{4}$) horizontal to one (1) vertical. In rock excavations all projections toward the center line of track beyond the plane of the measured prism, and all material on slopes, loose or liable to fall, shall be removed.

"(6) Roadbed and Ditches. The roadbed in cuts shall be directed by the engineer; also the size and form of side ditches. In rock excavation, material shall be taken out one (1) foot below subgrade, and filled in again to subgrade line with good material for roadbed; such back filling to be paid for as earth excavation."

"(9) Borrow Pits and Berms. Borrow pits shall be confined to such limits as the engineer may direct, and in all cases a berm of not less than ten (10) feet in width shall be left outside of the foot of any embankment slope, and one of not less than three (3) feet wide inside of the right of way lines. When berms of the minimum width are made, borrow pits must have side slopes not steeper than one (1) horizontal to one (1) vertical.

"(10) Classification. Material shall be classified only as solid rock, loose rock, and earth.

"(11) Solid rock shall include all rock in masses or ledges in their original or stratified bed or position, and boulders and detached masses of rock exceeding one cubic yard in measurement.

"(12) Loose rock shall include all shale, slate, soapstone, cemented gravel, and hard pan, and all boulders and detached rock exceeding two cubic feet and less than one cubic yard.

"(13) Earth shall include all loam, clay, sand, gravel, and all other materials which are not included in the above specifications of loose or solid rock. No classification whatever will be allowed in borrow pits, unless such borrow pits are selected and approved by the chief engineer."

After the road was built, one Charles M. Newton, as receiver of the Magoon Construction Company, on the 26th day of February, 1900, instituted suit in equity against said railroad company, said construction company, and said McCarthy & Reichardt, to enforce a lien against the railroad for $18,343.42 for work done by the lienor on the road as subcontractor. In an amendment to the bill it was charged that upon the completion of the work the engineer in

charge gave a certificate required by the contract, but "through fraud or some gross mistake in his estimates as necessarily implied bad faith, or through failure to exercise an honest judgment in the discharge of the duties imposed upon him, the engineer allowed less quantities than plaintiff was entitled to, in disregard of the provisions of the contract, and made no allowance for material placed in embankment," and, further, that the Magoon Construction Company did work not provided for by the terms of the contract by placing solid rock in an embankment on mile post 10, entitling the claimant to $1,700, which was unpaid.

McCarthy & Reichardt filed answer and cross-bill against the railroad company, the construction company and their co-contractors. The cross-bill, after setting out the contract in question, alleged that they had completed the work, and the final estimates had been furnished them; that they and their subcontractors had performed work and labor and furnished materials amounting to $834,769.25, upon which there remained unpaid $371,264.18, for which they were entitled to a lien on said railroad, pursuant to the provisions of an act of the Legislature of the state of Arkansas of the 31st of March, 1899 (Acts 1899, p. 145). They charge that improper measurements were made of the work, attributable to the employment of young, inexperienced, and incompetent assistants; that they made gross mistakes in measurements, computations, and classifications, and that the chief engineer, in making the final estimates, did not exercise an honest judgment; that the engineers, "either by gross mistake or failure to exercise an honest judgment in the estimates, and contrary to the requirements of the contract, have classified large quantities of solid rock in masses and ledges in their original and stratified beds as loose rock, and classified shale, slate, soapstone, cemented gravel, hard pan, boulders, and detached rock exceeding two cubic feet and less than one cubic yard, as earth." The cross-bill then alleged that in the final estimate the chief engineer included certain timbers in pile and frame structures which were not furnished under the written contract, and that the allowance was insufficient, through gross mistake on the part of said engineer or failure to exercise an honest judgment. It is then alleged that the solid rock through which they had to construct the railroad was not upon a line of the level of the railroad, but was in strata in an angle of about 15 to 45 degrees; that by reason of the angle at which the strata lay, under the requirements of the contract that the wall of the cut should be one-quarter horizontal to one foot vertical, the slope would not retain the stone of the walls of the cut in place, but allowed the same to fall upon that portion of the excavation intended for the roadbed; that through the failure of the engineer in not providing for proper slope in the cuts made through solid rock, and in not taking into consideration the angle of the strata of the stone, they were compelled to remove stone that had fallen upon that portion of the excavation intended for the roadbed at great expense; that it is the universal custom, in cases where the slopes in solid stone are not sufficient to prevent the sides from falling into the cut made for the railroad, to pay for the removal of such material; that they have not been made adequate allowance therefor, either by reason of gross mistake or a failure on the part of said engineers to exercise an honest judgment. It further charged that the chief engineer instructed his assistants, in making approximate estimates for monthly payments, to disregard the provisions of the contract in relation to estimating the whole amount earned by them, whereby they would not receive 90 per cent. of the value of the work performed in each month; that the assistant engineers, following said instructions, did not exercise an honest judgment, in accordance with the terms of the contract and specifications, but, in violation thereof, under the advice, etc., of the chief engineer, allowed not over 50 per cent. of the value of the work performed and materials furnished by them each month; that in some instances the estimates were not furnished for six months after they were due; that the railroad company and construction company did not have the money with which to pay the full 90 per cent., and for that reason they directed the engineers to do the act in this respect complained of; that the complainants and their subcontractors made a protest against the monthly estimates, and the engineer promised that he would have correct estimates made, which he failed to do, whereby they were compelled to advance money out of their individual funds, and to

borrow money and pay large amounts by way of discount and interest in order to perform their contract, to their damage and injury in the sum of $15,000. It alleged that they performed work and furnished material not included in the final estimate amounting to $2,246.97, which was omitted from the final estimates by gross mistake or by said engineer refusing to exercise an honest judgment in relation thereto. It also charged that the final estimates were not made upon new estimates made since the making of the monthly estimates. The prayer of the cross-bill is that the cross-complainants be decreed to have a lien on the railroad for the balance due them, and that the same be enforced, etc.

The Choctaw & Memphis Railroad Company filed answer to the original bill, tendering issue as to the alleged indebtedness of the construction company and the indebtedness of McCarthy & Reichardt to the complainants. The answer then pleaded the provisions of paragraphs 24 and 25 of the contract, and alleged that such final estimate and award was made, and that it was ready to comply therewith, but the complainant had declined to accept payment on the basis of the final estimate, and acknowledge and deliver a release and discharge from any and all claims and demands for and in respect of all matters and things growing out of or connected with said contract, or to release the alleged lien upon said work, or to furnish the required evidence, to the satisfaction of the chief engineer, that the work covered by the contract was free from liens for labor and material, in accordance with the provisions of the contract. It put in issue the allegations of fraud, etc., made in the bill. It also made answer to the cross-bill, taking issue upon its material averments, alleging compliance on its part with the provisions of the contract in every respect. It alleged that the roadbed was constructed upon the side of slopes, and a large portion of the loose materials which fell from the walls above the roadbed did not rest upon the track, but passed over it and fell into the Arkansas river, which ran near the foot of the slope in many places, and at other places on the level at the foot of the slope below the roadbed; that the only extra work required to be done by cross-complainants with respect thereof was the removal of such ·parts of the loose material as lodged on the roadbed, by shoveling it over the bank into the river, and onto the flats at the bottom of the slope; that under the contract the cross-complainants were not entitled to any allowance for the removal of said material; that the chief engineer classified the same as loose rock, and allowed them therefor in his final estimates; that such allowance was fairly and honestly made pursuant to the contract. It alleged that under the provisions of the contract the contractors were required to promptly pay all subcontractors, materialmen, and laborers as often as payments were made to them; that before final settlement for the work done and materials furnished, and before any right of action should accrue to the contractors, they were required to furnish evidence satisfactory to the chief engineer that the work covered by the contract was free and clear from all liens for labor and material, and no claim existed against the same for which any lien could be enforced, and before final payment could be demanded, the contractors were required to acknowledge and deliver a release and discharge from any and all claims growing out of said contract, and all claims and demands whatsoever; that the cross-complainants have not furnished such evidence, and have not complied with said requirements, but, on the contrary, said contractors are indebted to the subcontractors mentioned in the cross-bill in large sums for work, labor, and materials; that, if the contention of the cross-bill that they are entitled to a statutory lien on said railroad be true, then the cross-complainants have not complied with the provisions of the contract so as to entitle them to maintain the cross-bill; that the contractors have refused to acknowledge and deliver a release and discharge of all claims and demands aforesaid.

The foregoing answer of the Choctaw & Memphis Railroad Company was, by leave of court, adopted by the Choctaw Construction Company. A large number of subcontractors under McCarthy & Reichardt filed intervening petitions in the progress of the cause, claiming liens for sums due them from the contractors. On December 6, 1900, by consent of the parties, T. B. Martin was appointed special master to take the proofs and make findings of fact

and conclusions of law on the issues involved. On November 14, 1901, a supplemental bill was filed, alleging that since the filing of the original bill and making up the issues thereon and the beginning of the taking of the testimony, the Choctaw & Memphis Railroad Company had sold and transferred its railroad to the Choctaw, Oklahoma & Gulf Railroad Company, which now owns said railroad and is engaged in the operation thereof; that one of the considerations of said sale was the undertaking on the part of the purchasing company to pay all the debts of the vendor company, including that due the complainant—to which the new company entered its appearance. On April 30, 1903, the master filed his report, with the evidence taken, covering between 3,000 and 4,000 pages of printed testimony, with large numbers of exhibits, together with the objections to his findings. The finding was in favor of the original complainant, the cross-complainant, and the interveners, and in favor of the vacation of the award of the chief engineer. To this report of the master a large number of exceptions were filed to every important matter contained therein.

After the hearing of these exceptions by the court, it referred the matter back to the master to make findings in conformity with special directions given by the court, to be based upon certain defined conclusions of law: (1) That under the terms of the contract the chief engineer was the final arbiter to finally decide the true intent and meaning of the stipulations and provisions of the contract. (2) That under the provisions of the contract the chief engineer was the final arbiter to decide all questions relating to the stipulations and provisions of the contract, and the amounts, quantity, character, kind, and classification of all work and materials, and that his decision on all such questions in construing the terms and provisions of the contract would have the force and effect of an award, and be final and conclusive. (3) That the chief engineer's decision could only be set aside upon evidence that the arbiter, in passing upon the matters so committed to him, acted fraudulently, or that he committed such gross mistakes as necessarily implied that he acted in bad faith, or made such gross mistakes as would necessarily imply a failure on his part to exercise an honest judgment; that any error or mistake made by him through negligence, carelessness, or incompetency on his part, if he acted in good faith, was not sufficient to warrant the vacation of the award; that the legal presumptions are in favor of his honesty, and the burden of proof to establish fraud or bad faith rests upon the complainants. "To warrant a finding that the engineer, in his actions as umpire, was guilty of fraud or made gross errors in the measurements or classifications, or in the construction of the terms of the contract, the evidence must be reasonably convincing; and, further, that fraud alone would warrant the court in setting aside the award, and gross errors made by the engineer all against one party and in favor of the other are merely evidence, which, taken in connection with other evidence and circumstances, may justify a finding of fraud, on the ground that they were intentional, and not merely the result of mistakes made in good faith. It was not sufficient that it should be constructive fraud, but fraud in fact, based upon the intention of the party; and such fraud may be implied as well as expressed."

Within a few days after the re-reference, the master made a supplemental report, in which he states that he found that the chief engineer and the defendant railroad companies, with the fradulent intention to deprive the contractors of a just and fair final estimate, and their just compensation, failed to carry into pay quantities in some of the monthly estimates, and in his final estimate, a large quantity of classified material taken from borrow pits and placed in embankment; that with such fraudulent intent he failed to apply a proper construction of the contract to the work where changes were made in the line of the roadbed; that with such intent in estimating slides he adhered to an arbitrary standard of payments not warranted by the contract; that he frequently failed to credit them with refill; that with such intent he unjustly classified large quantities of material used in the construction of the roadbed. Exceptions were duly taken to this supplemental report. On July 11, 1903, the court overruled the exceptions, and entered a decree affirming the master's report, in favor of McCarthy & Reichardt, con-

tractors, in the sum of $241,799.83, and in favor of the intervening subcontractors for the amounts respectively due them. It declared a lien on the railroad property, and for its sale in satisfaction thereof. To reverse this decree the defendants below prosecute this appeal.

J. M. Moore and W. F. Evans (M. A. Low and W. B. Smith, on the brief), for appellants.

John McClure and George B. Rose (U. M. Rose and W. E. Hemingway, on the brief), for appellees.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

The parties to the contract in question in the most solemn form and explicit terms conferred upon Mr. Molitor, the chief engineer of the railroad company, most plenary powers and wide discretion in determining the nature and character of the work in its progress, the classification of material, the estimation for payments, and under what head the compensation therefor should be allowed. A reference to paragraph 25 of the contract shows that this power was conferred upon the chief engineer to prevent disputes or misunderstandings between the parties relative to any of the stipulations and provisions contained in the agreement, the true intent and meaning of the specifications, plans, profiles, and drawings, and also the matter of the performance of the contract by either of said parties. It expressly stipulated that the chief engineer at the time was made, constituted, and appointed umpire to finally decide all such questions and matters; that he should determine and set forth in the final estimate the amount, quality, character, kind, and classification of all work and materials performed and furnished by the contractor under the contract, including all extra work and material, "and his decision and determination as to any and all such questions, matters, and things, and in construing any of the terms and provisions of this contract, shall have the force and effect of an award, and shall be final, binding and conclusive, to all intents and purposes and in all places, upon the said parties hereto; and the contractor hereby waives all objections to the appointment of said chief engineer as umpire by reason of his being a stockholder, director, or officer of the company." It also conferred upon him the power to appoint all necessary assistants, resident and division engineers, etc., to represent him, and to vest in them all the powers conferred upon him. "Said chief engineer may take final action as umpire upon any and all questions, matters, and things arising under this contract, upon the reports and statements of said assistant, resident, and division engineers or other agents, without notice to the parties hereto or personal inspection of the work, and all of his acts in the premises shall be final and conclusive, and binding upon the parties to this contract."

In making such a contract the parties dealt with each other at arm's length. The contractors were at perfect liberty to consent to the provisions of the contract or to refrain from bidding. They are presumed, before bidding or signing the contract, to have fully advised themselves

of the competency, integrity, and judicial fairness of the selected umpire. Their voluntary acceptance of him as the final arbiter on disputed matters, as declared in the contract, precludes them from any consideration or sympathy because of the engineer being in the employ of the railroad company. Such stipulations are evoked out of the experience of railroad companies in such construction work. From its very nature, extending over a long line of road, with diversified topography of country, encountering many varieties of geological formation, and difficulties impossible of anticipation, the variant views and notions of contractors and subcontractors respecting the infinite details of the work, the classification and measurement of material, the prevention of incessant wrangles over the work, with its annoyances and litigation, justified the railroad company in requiring, as a condition precedent to letting the construction of this work, the acceptance of the foregoing provisions of the contract. The contractor is presumed to protect himself against possible loss resulting from any adverse judgment of the engineer by the amount of his bid; and when litigation arises over the decisions and award of such an umpire, the courts cannot, without making a new contract for the parties, disregard such positive provisions, or set aside the action of the umpire, except for the most grave and cogent reasons. Hence it has become the settled doctrine of the law that to give the contractor any standing in a court of equity to vacate the final award of the engineer, and give him judgment for a greater sum than that allowed in the final estimate, the contractor must show by an overwhelming weight of the evidence that the engineer was guilty of fraud, "or exhibited such an arbitrary and wanton disregard of the complainant's plain rights under the contract as to be the equivalent of fraud, or committed errors and mistakes to the complainant's prejudice so gross and palpable as to leave no doubt in the mind of the court that grave injustice was thereby done him. * * * It is not material how the weight of the evidence may be upon this point, unless it shall appear that it is so overwhelmingly with the complainant as to give reasons for thinking that the chief engineer's judgment was biased, partial, and consciously unjust." Mundy v. Louisville & No. Ry. Co., 67 Fed. 633, 638, 14 C. C. A. 583; Elliott v. M., K. & T. R. Co., 74 Fed. 707, 21 C. C. A. 3.

The language of some of the courts, of highest authority, is that the proof of fraud must satisfy the mind of the court beyond a reasonable doubt. It is not sufficient that it should arise from a mere erroneous or unjust judgment or opinion of the umpire; nor can the award be disturbed upon the mere weight of evidence, in the conflicting opinions of expert witnesses, or based on the notion of a master resulting from a technical analysis of the evidence. As said by Justice Redfield, in Vanderwerker v. R. R. Co., 27 Vt. 130:

"After an estimate by the engineer, no recovery can be had beyond that sum, unless upon the most irrefragable proof of mistake in fact, or positive fraud in the opposite party in procuring an underestimate, or corruption in the engineer."

A mere mistake by the arbiter, not admitted by him, is insufficient to vacate the award. "How could the court adjudicate on the conflicting

evidence of a mistake made by an arbitrator? The mistake is in his own mind; and if the arbitrator does not admit that he has made a mistake. surely the duty of the court would be to reject the conflicting evidence and hold that without the admission there was no proof of mistake at all." Whitley & Roburts' Arbitration, 1 L. R. Ch. 558.

While great deference is to be shown by the reviewing court to the master's findings on such an issue, yet, where it is apparent that the evidence upon which he has acted fails to come up to the requirements of the adequate proof essential to warrant the court in overturning the award made by the umpire selected by the parties themselves, it is the duty of the court to overturn the findings of the master. The allegations of the bill impeaching the award do not fully come up to the standard fixed by good rules of pleading. It will be observed that the allegations are in the alternative—either "through fraud, or some gross mistake in his estimates, as necessarily implied bad faith, or through failure to exercise an honest judgment, etc." This was certainly bad for uncertainty, and invited a demurrer. But inasmuch as the respondents seem to have waived the objection by going to trial, and it is not apparent that they suffered any injury by the uncertainty, we are not disposed to halt on this objection.

A more serious, germane question, however, is presented by the direction given by the court in re-referring the case to the master. In his original report the master made no specific finding respecting the provisions of the contract above referred to, or as to the matter of the essential fraud or dishonesty of the engineer in rendering his final estimates, without which specific findings no decree vacating the award could be rendered. After sustaining this exception to the master's report, the court, in recommitting it to the master with specific directions for additional findings, inter alia, said:

"To warrant a finding that the engineer, in his actions as umpire, was guilty of fraud or made gross errors in the measurements or classifications, or in the construction of the terms of the contract, the evidence must be reasonably convincing."

The term "reasonably convincing" was liable to lead to a hurtful misconception on the part of the master. It might mean a mere preponderance of the evidence, a weighing of the relative strength of conflicting testimony, as would be sufficient to reasonably convince the mind that there were gross errors and the like. Whereas, the language of the law is that the evidence which will warrant a disturbance of such an award must be "the most irrefutable proof," "overwhelming," or persuasive "beyond a reasonable doubt," or "free from all doubt and convincing," or "so outrageous, etc." There is, therefore, merit in the exception taken to said language by appellants, as the term "reasonably convincing" made the way easy for reaching the conclusions of the master.

It is difficult for the impartial mind to read the conflicting testimony of witnesses on many of the controverted matters on which the master made an adverse finding on the final estimates of the engineer without the conviction that the conclusion was reached by resolving too many reasonable doubts against the engineer, and accepting as his mentor

and guide the testimony and conclusions of the witness Reaugh, who was the selected expert of the contractors to go over this work after it was practically completed, and to review the final estimates of the engineer. This will sufficiently appear by taking up in their order the principal matters in controversy on which the master's adverse report was predicated:

### Borrow Pits.

The master found that the chief engineer "failed to carry into pay quantities in some of the monthly estimates, and in his said final estimate, a large quantity of classified material taken from borrow pits and placed in embankment." What is known as "borrow pits" are pits dug along the side of the roadbed for the purpose of making embankments, where the material coming out of cuts and the like is insufficient for the construction of embankments. If, as the language of the master's report implies, he found that there was a diminution by the engineer of borrow quantities consequent upon his failure to carry into pay quantities a large amount of classified borrow, it is in conflict with the evidence in the record. The total quantity shown by the final estimate of the engineer is 522,606 cubic yards. The aggregate quantities of all classifications made by the expert witness Reaugh is 514,233 cubic yards. By diminishing the quantity of earth and increasing the loose rock, as estimated by the engineer, Reaugh increased the value of the material to the extent of $34,324.33; while his estimate of quantity of all material is 8,373 cubic yards less than the engineer's final estimate. The master, however, fixed the valuation at $29,634.19 in excess of the engineer's allowance, and $4,690.16 less than Reaugh. How he made this differentiation his report is silent, as he gave no detailed specification.

The whole trouble over the borrow pit estimates grows out of a palpable disregard by the witness Reaugh, followed by the master, of the explicit provision of the contract respecting these borrow pits, and the designation of material that came out of them as "hard pan." Paragraph 13 of the contract declares that:

"No classification whatever will be allowed in borrow pits, unless such borrow pits are selected and approved by the chief engineer."

This means exactly what it says. It is too explicit and mandatory to admit of controversy. It was intended to effectually interdict the very contention made by appellees that all the borrow pits claimed by them had either been recognized by the resident engineers or were essential for obtaining the necessary embankment material. The engineer testified, without contradiction, to the number of borrow pits designated by him or his deputies, and that he classified 19, including the slide material used as borrow, and 12 excluding the slides. Regardless of such designation, Reaugh classified all material coming from borrow pits, and arbitrarily set up his own judgment as to what were borrows for estimation and classification. The cross-bill does not even charge that the chief engineer failed and refused to designate the borrow pits, but is framed upon the theory that he failed to make proper classifications and estimates.

### Hard Pan.

The exaggeration of the figures over those of the chief engineer, in this connection, furthermore resulted from Reaugh's classification of an immense amount of material taken out of borrow pits as "hard pan." As hard pan, under the specifications of the contract, was to be classified as loose rock, to be paid for at 33 cents per cubic yard, and loose earth at 13 cents per cubic yard, it made a wide difference in the computation whether the material in question was hard pan or earth. Hard pan, under paragraph 12 of the contract, was to be classified as loose rock. Paragraph 13 declares that:

"Earth shall include all loam, clay, sand, gravel, and all other materials which are not included in the above specifications of loose or solid rock."

The evidence bearing upon the question as to what constitutes hard pan under this contract is most conflicting. The test applied by the witness Reaugh was that any earth or clay is hard pan which is hard enough to require a pick or other means to loosen it enough to pick it up with a spade or shovel. In this view he was corroborated by other witnesses. On the other hand, this theory was stoutly combated, not only by the chief engineer and the resident engineers on the work, but by outside experts of equal competency and integrity and as wide experience as those in behalf of appellees; and this is supported by the classification as earth made by the resident engineers and the chief engineer. The master himself in his report states that he found it impossible to reconcile the differences between the witnesses as to the proper definition of hard pan, and reached the conclusion that in railroad construction no unvarying standard or definition had been established to enable him to fix the term "hard pan." Even the standard dictionaries are not agreed thereon. He said in conclusion that:

"With their varying ideas of just what constitutes hard pan, as employed in the specifications, it is not surprising that there should be a difference in the classification of the material made by the engineers. When I say engineers, I do not refer to Molitor (the chief engineer) and Reaugh, but to all who have testified on that subject. And in this behalf it is not improper that I should report that I have found the same difficulty in knowing how I should classify the material."

And finally he accepted as the standard definition the Century Dictionary. I submit that the contract did not make the Century Dictionary the umpire on this question; but, on the contrary, the contract expressly declares that the chief engineer of the company—

"Is hereby made, constituted, and appointed the umpire to finally decide all such questions and matters; and he shall also determine, and set forth in the final estimate, the amount and quantity, character, kind, and classification of all work and materials performed and furnished; * * * and his decision and determination as to any and all such questions, matters, and things shall have the force and effect of an award, and shall be final, binding, and conclusive upon the said parties hereto."

As said by Judge Gantt, in Williams v. Railroad Company, 153 Mo. 487, 543, 54 S. W. 689, 707:

"The fact that honest witnesses have deposed that there was hard pan, and equally honest witnesses testified it was not hard pan, cannot affect the defendant, because it had a right to abide by the finding and classification of

the engineer to whom both parties had committed that question. It was to avoid this very conflict of evidence that this stipulation was placed in the contract."

### Refills or Back Fills.

Paragraph 6 of the contract provides that:

"In rock excavation, material shall be taken out one foot below subgrade, and filled in again to subgrade line with good material for roadbed; such back filling to be paid for as earth excavation."

In his final estimates the chief engineer allowed 7,523 cubic yards of back fill, and 26,669 cubic yards of subgrade on section "R" to 40, inclusive, on the construction work. On the same section Reaugh reported 27,888 cubic yards of back fill, an increase in quantity of 20,365 cubic yards and allowed 37,927 yards of subgrade, an increase of 15,258 cubic yards—a total increase of 35,623 cubic yards. This he effected by the following changes in classification of material: Earth reduced to 20,365 cubic yards, loose rock increased 4,446 cubic yards, and solid rock increased 10,817 cubic yards—an aggregate increase in value of $10,661.83. The master approximately followed Reaugh's classification, increasing the money value, over the final estimate of the engineer, in the sum of $9,153.17, stating in his amended supplemental report that the chief engineer "had fraudulenty failed to credit the contractors with refill, which under the contract they are entitled to."

The important evidence to support this change is that of the witness Reaugh, who simply stated that 13,256.17 cubic yards of back fill, as shown in the final estimates, had not been paid for, or even in pay quantities; and in another place in his testimony he gave a statement of the amount paid for or accounted for, and that the deficit occurred largely in the residency of MacCrea and Herring, resident engineers. The resident engineers on this work gave in detail the character of this work and their observation and accounting thereof. In substance it is that the subgrade was not taken out by the contractors to a foot below the profile grade throughout the extent of this work, and then back filled with select material, and therefore they allowed the full depth as excavation quantities; that the subgrade as to such points was carried as pay quantities, and not as back fill, because the subgrading was not down to the full depth, the regular foundation in place not having been disturbed. In such cases the subgrade to the full depth was allowed, whether taken out or not. On Herring's residency, he testified that a large part of the material used in refilling was shale and slate, and the like—not at all suitable material—put in by the contractors contrary to instructions and against protest. Mr. Beard, the assistant engineer on this division, testified that on inspection at the time he directed the resident engineers not to allow for this as back fill, for the reason that the material was unfit, taken by the contractors from ditches and the edges of cuts, composed of such materials as rendered it absorbent of water, and, furthermore, that the contractors had once been paid for this material in excavation taken from cuts.

Of all men acquainted with the foregoing asserted facts, the contractors themselves are to be presumed to have had knowledge; yet

they did not take the witness stand to contradict the statement of facts aforesaid by the engineers, or give any explanation about it. They were actively engaged on the work; and while their subcontractors testified in the case, not one of them, so far as we are able to find, attempted to assign any reason in support of the classification made by the witness Reaugh. Where a party has the means of producing testimony within his knowledge or keeping upon a material question involved in the case, and fails to do so, the presumption arises that the fact is against him. Gulf, etc., Ry. Co. v. Ellis, 54 Fed. 481, 483, 4 C. C. A. 454; Clifton v. United States, 4 How. 242, 244, 11 L. Ed. 957; Graves v. United States, 150 U. S. 120, 14 Sup. Ct. 40, 37 L. Ed. 1021; Runkle v. Burnham, 153 U. S. 216, 225, 14 Sup. Ct. 837, 38 L. Ed. 694; Kirby v. Tallmadge, 160 U. S. 379, 383, 16 Sup. Ct. 349, 40 L. Ed. 463. This failure of the contractors to testify is quite common to nearly all of the disputed facts in controversy. The only explanation attempted of this omission is in the volunteered statement of appellees' counsel that the contractors were not experts. Aside from the fact that there is no evidence showing a lack of knowledge on their part, their letters to the chief engineer, complaining of the failure to make proper monthly estimates, and respecting other matters connected with the work, would indicate that they claimed to be well posted, both about the quantity and quality of the work. Furthermore they were old contractors in railroad construction, and were on and about the work when it was being done.

The sole reliance, almost, for the master's finding in respect of this back filling, is based upon superficial experiments and speculations of the witness Reaugh, who went over this work after the roadbed was completed and the ties and rails were down, and here and there along the line digging down to the foundation. This was, in the very nature of things, but superficial and speculative. We submit that if on such a state of facts the action of the chief engineer in making his final estimates, based upon the observation and memoranda made by the resident engineers on the work when being actually done, can be vacated for fraud or corrupt judgment, the provisions of such a contract as this are mere cobwebs.

The answer made to this by appellees' counsel is that the chief engineer accepted this work after the alleged objection thereto by the division engineers. This contention is predicated of the correspondence between the contractors and Chief Engineer Molitor. On March 9, 1900, the contractors wrote to Molitor, calling his attention to paragraphs 24 and 25 of the contract, requesting him to furnish the final statements as therein provided. On the 14th day of the same month the engineer replied, calling the attention of the contractors to the fact that paragraph 23 of the contract contains a provision that before final settlement made for the work and material, and before any right of action could accrue to the contractors, they should furnish satisfactory evidence to the chief engineer that the work is free and clear from all liens for labor and material, and that there was no claim for which a lien could be enforced; that paragraph 24 provides that, when all that was agreed to be done by the contractors should have been performed and finished

according to the contract, the chief engineer should make and return final estimates, etc.; concluding with the statement that:

"Until the provisions of paragraph 23 shall have been complied with, I would probably not be warranted in furnishing a certificate in connection with the final estimate in the form and to the extent contemplated by the provisions of paragraph 24; but I have no disposition to embarrass you in any way by withholding the certificate. At the time the final estimate which you now have was furnished you, that question did not arise or occur to me, and I had supposed that the final estimate, with my signature to it, would be taken as a compliance with the provisions of paragraph 24; but, since my attention has been called to the matter, I will say that I am willing to give you a certificate as provided in the paragraph referred to, subject to the provisions of the twenty-third paragraph."

There might be some plausibility for said contention had the engineer furnished the final estimate embracing the allowance for said material as back filling; but as this was not done, and the contractors were advised at the time the work was done that the material would not be accepted, there is no foundation for an estoppel, even if it had been pleaded, which was not done. The ruling in Fuller Co. v. Young Co., 126 Fed. 343, 61 C. C. A. 245, cited by appellees, is not apposite. The contract there did not contain an express provision that no intermediate action in allowing monthly estimates, or other action in limine, should avail, and that the final estimates should be conclusive, and the like. Nor was there any objection to the work at the time it was done, as here.

### Differences in Classification of Material in Certain Cuts.

Without going into detail as to the differences resulting from the classification rather than the quantity of material in cuts, the final estimates of the witness Reaugh, practically followed by the master, result from his large allowances for solid rock and the elimination of earth and loose rock. A careful reading of all the evidence persuades us that his conclusions were necessarily based largely upon theory rather than actual facts proved, and were speculative rather than specific.. He went over these cuts some considerable time after they were made, when the roadbed was completed and the ties and rails were generally in place. As the cuts ran along hillsides, with only the back wall facing, it is at once manifest that, in taking the indications of this facing as a basis of classification and estimation, there was in it such an element of uncertainty as to invite the closest scrutiny into even its approximate accuracy. He could know nothing reliable as to the earth débris overlying the surface within the prism of the slope stakes. The testimony, without any material contradiction, shows that overlying these cuts, before the excavation, were from one to two, and two to three, and three to four feet of earth débris; that the rock lay in irregular strata, with a mixture of loose and solid rock and other loose material, running in irregular dips, rendering it mere guesswork by any expert, viewing it after the completion of the road, as to how much solid rock extended throughout the cut. The witness Reaugh testified that in such case he ascertained where the rock formation extended to the base of the roadbed by digging around in a few places and finding within a

few feet where the strata cut the bottom under the bank fill, and in that way he could get within two or four feet of where the surface line of the rock would cut the grade plane, which, with the inclination of the strata indications, would enable him to locate very closely.

We submit that no railroad company would consent in advance to pay for such a large amount of construction work on such methods. It requires no expert eye to see that in taking a platted cross-section of the hillside, with irregular strata of varying dip, where the classification line is drawn from such back wall to an intersection with the bottom line of the cut, that a removal of two to four feet either way would inevitably make a considerable, if not vast, difference in the quantities of material within the sides of the triangle. On the other hand, it is the direct testimony of the resident engineers engaged on the work, and the assistant engineer who made observations and noted the work in its progress from day to day, who cross-sectioned it, as to the large quantity of earth and débris overlying, as to the loose rock and solid rock within the prism, as shown by the sectionized plats filed as exhibits, which formed the basis of the final estimates made by the chief engineer. Superadded to this is the testimony of the expert witness Bontecue, an outside engineer, of wide experience and manifest intelligence, who testified, after inspection and examination of the finished work, that it was practically impossible for any engineer, no matter how skilled or painstaking, to make approximate reliable classification of the solid material taken out of cuts of such geological formation. He gives as a reason for this, as to one of the principal cuts, that he did not consider that an intelligent classification could be made; that there was only one side of the cut generally exposed, with a very large face extending 1,000 feet along one side, and that evidently a more or less triangular section had been removed in making the roadbed; that the face of the cut showed various kinds of rock, so that there was nothing to guide an after-comer in determining how far out into the triangular section the material originally extended; that it presented a case where there had been loose rock and solid rock, and possibly earth; and that it was not practical to tell how far into the cut the solid rock ran, or the amount or rubbish that may have overlain it, or how much of loose rock was intermixed.

The witness Reaugh himself testified, in substance, that, where there was only one wall of the cut visible, the general contour of the bluff was irregular, the angles or dips were not uniform, and the conditions were not usual; that if the stratified material was level, in making his classifications he would assume that such strata continued to the surface, and if the strata inclined downward, toward the outer edge of the bluff, he assumed that the bottom of the cut would define the place where the top stratified rock cut the grade line or the grade plane. On such a state of evidence, to vacate the award of the chief engineer, upon the ground that he had arbitrarily and wantonly refused to make such a classification of solid rock as the witness Reaugh thought he should have made, would be nothing more than to substitute Mr. Reaugh for the umpire agreed upon by the parties.

## Pinnacle Cut.

What is known as the "Pinnacle Cut," about 1,500 feet long, is a fair sample of the weakness of Mr. Reaugh's methods and their unreliability. From this cut was removed 15,207 cubic yards of material, distributed in the final estimate as follows: 1,520 cubic yards of earth, 13,281 loose rock, and 400 yards of solid rock. Reaugh classified it: 1,841 earth, 10,450 loose rock, and 2,914 solid rock. The resident engineer's testimony shows that this cut at one end was composed of red clay, with a mixture of yellow and red clay at the other end, with a few boulders intermixed therein, and that there was no material in the cut that came up to the requirement of solid rock, except a few boulders exceeding a cubic yard in size; that during the time he was engaged on that work he never saw a half dozen rocks that would measure enough to make a yard; that they were all below the specifications for solid rock. This testimony of Bowles pertains to his observation after he came on the work, when about one-third of it was completed. The assistant superintendent engaged on this division testified that he was present at the time of the stripping of the surface of this work, and that he gave it particular attention after about two-fifths of the material had been removed; that the material was very similar from top to bottom, and throughout its length; there were boulders imbedded in clay and hard pan, but he found no material which would entitle it to be classified as solid rock; that before he took charge there were some estimates returned by the resident engineer opposite the boulders taken from the south end of the cut; that there was nothing in his observations which would entitle it to be classified as solid rock, and that the 400 yards of solid rock allowed was ample; that there was nothing in the cut after the work had been completed to enable any engineer to estimate the quantity of solid rock that had been removed, for the reason that the material had been moved away; and that there was no indication on the side of the cut or around it of boulders to be classified as solid rock. The expert witness Bontecue made a thorough inspection of this cut and tested the sides with a pick. He testified that in the only places he deemed it possible there might be a solid rock ledge, he found none; that in his judgment 400 cubic yards, allowed by the chief engineer, amply covered the probabilities of the situation. His judgment was that the allowance of 2,914 cubic yards of loose rock, made by Reaugh, was approximately correct, and that no accurate estimate of the amount of boulders which should have been measured as solid rock could be made. The exaggerated amount of solid rock estimated by Mr. Reaugh, we think, was simply arbitrary, and on the mere weight of evidence it should be rejected.

## Timber, Piling, and Extra Work.

The witness J. T. McCarthy, relied upon by appellees, testified that there was a difference between what he estimated and the final estimates in the item of timber of 167,946 feet, making a difference in value in favor of the contractors of $3,694.71, and of the piling of the value of $1,476.74. The cross-examination developed the fact that he had in-

140 F.—16

cluded in the estimate for timbers in certain sections which he had been paid for, and, of course, were not included in the final estimate, which unduly swelled his estimate to 100,000 feet. He had little personal knowledge of the matters testified to, and his statements were based upon reports made by employés of the contractors. Mr. Dean, an employé in the office of the chief engineer, produced an exhibit made up by comparing the records in the office of the chief engineer, returned by the resident engineers, with a statement exhibited by said J. T. Mc-Carthy. From this statement the total differences between the two statements was 46,657 feet board measure of timber, and 6,000 feet of piling; while the witness Holliday, in behalf of the complainants, testified that he made an examination of the timber purchased with the bills rendered to the contractors by the chief engineer and there was a difference between them. His conclusions were based upon copies of the statements furnished by the chief engineer, and not the originals, and he made no detailed account of the timbers. The testimony of the resident engineer, Mr. Bowles, gave a detailed statement of what the timber consisted; that all the timber and piles on the residency were estimated and returned to the chief engineer. So, when the evidence pro and con touching this issue of fact is fairly analyzed and weighed, it is reduced to a question of mere difference of opinion between Holliday and the resident engineers on the work; and we are utterly unable to discover any basis for imputing to the resident engineers any corrupt or evil motive in their report touching this matter.

Said McCarthy presented a claim of $2,242.28 for extra work, and the master allowed him $2,322.86. By what process the master reached this beneficent result in favor of McCarthy the record does not disclose. The examination of the claimant showed that he had little personal knowledge of the work; that his claim was based much upon reports of subordinates. On the other hand, the testimony of Mr. Bowles, the assistant engineer on this division, is direct to the effect that the items disallowed had been paid, that many of them came within the specifications of the contract as work capable of measurement, and, therefore, they were excluded as extra work, but were included in the estimates made. Paragraph 6 of the contract provides that all extra work shall be done on the written order of the chief engineer, fixing the price to be paid for the same; that the obtaining of the certificate of the chief engineer as to the work done and the price thereof shall be a condition precedent to the right of the contractor to be paid for any such extra work, and that nothing shall be deemed extra work which can be measured; that all claims for extra work or material be presented to the chief engineer at the close of the month in which it was done or furnished, to be included in the estimate for that month, otherwise all claims therefor shall be deemed waived by the contractors, and the contractor shall not be allowed or paid for the same. The testimony fails to show that these provisions of the contract were complied with. McCarthy himself testified that he was unable to state whether the extra work was ordered by the chief engineer; that while his bills were rendered in March, 1900, he said he was never able to find them at the

chief engineer's office. The allowance of this claim was in the teeth of the provisions of the contract, and is unsupported by the weight of evidence.

## The Slides.

The principal controversy in this case centers around what is designated as "slides," on the bluffs known as "Ross Hollow," and on residency D4, embracing sections 23 to 31. The roadbed at these points was located along steep bluffs near the south bank of the Arkansas river. Much of the roadbed was cut out of the side of the bluffs, which were quite steep in places, and extending several hundred feet above the roadbed. At some points the bluff was so steep as to prevent the growth of vegetation on it. The testimony of the resident engineer was to the effect that underlying a débris of earth, etc., was rock of irregular strata of various thicknesses, ranging from four inches to three or four feet, of irregular formation. The roadbed, of course, was made by blasting the material out of the side of the mountain. Paragraph 5 of the general specifications declares that:

"Excavations in rock shall be taken out 18 or 20 feet base, with slopes of one-quarter horizontal to one vertical. In rock excavations, all projections toward the center line of the track beyond the plane of the measured prism, and all material on slopes loose or liable to fall, shall be removed."

No excavations were necessary on the river side; but the work was on the hill side, where the slope in some places continued below the roadbed for a distance of 30 or 40 feet, and at some points the face of the bluff extended to the water's edge, and at others there were intervening flats between the foot of the slope and the water. In blasting for the construction of the roadbed, large quantities of material fell outside of the roadbed into the river and onto the flat places, and some of it was thrown even beyond the river. Owing to the peculiar geological formation of the rock, lying in irregular strata, when the supporting rock at the base of the roadbed was removed, the superincumbent strata of rock would break and slide down, much of it falling beyond the railroad bed, and much of it on the roadbed. It is this material which is designated as "slide," distinguished from that which was taken out within the slope stakes in the estimates of the engineer. That taken out within the slope stakes was treated as roadbed excavation, and was classified with reference to its original position in the bluffs, and a large part of it as solid rock. The slide began to fall in December, after work begun. About the month of March, 1899, a large amount of this slide attracted especial attention, and the contractors began to complain that the resident engineers, in their monthly estimates, were only carrying this material as earth, instead of solid rock, to their great distress and embarrassment in not receiving the 90 per cent. to which they claimed they were entitled. In April following the chief engineer directed the bluffs cross-sectioned for the purpose of ascertaining the extent of the excavation; the evidence on his part tending to show that he was in great doubt in his mind as to how this slide material should be classified. On account of the falling of this slide material and the difficulty of the construction of the road on the bluff side, the engineer abandoned this location and

threw out the line of the road to an embankment beyond, as he was authorized to do under the contract. ,

The contention of the contractors is that they were entitled to pay for all the slide material, to be classified in its original condition in the bluff before it was dislodged, and, therefore, to be estimated and paid for as solid rock. This view was sustained by the master in his report. On the other hand, the chief engineer classified it principally as loose rock, including all that which went beyond the roadbed into the river or beyond the embankment, as well as that which fell on the roadbed. The testimony on behalf of appellants tended to show that perhaps 40 per cent. of this material fell beyond the roadbed, and was not handled at all by the contractors, and that the great mass of that which fell on the roadbed was thereby so broken and shattered as to make it loose rock, removable with shovel, and with very little blasting of the larger stones. So that in estimating it as loose rock, both as to the quantity that was not handled at all and that which was handled in removing it from the roadbed, the chief engineer deemed his classification and estimation more than just to the contractors.

The contention that said paragraph 5 of the contract warrants the classification of this slide material as solid rock in its place before its dislodgement is evidently an afterthought, as it is contrary to the allegations of the cross-bill of complaint. In respect of this slide the cross-bill declares "that it is the universal custom, in cases where the slopes in solid stone are not sufficient to prevent the sides of the cut from falling into or upon the cut made for the railroad, to pay for the removal of such solid rock, loose rock, and earth," and that they have not been made adequate allowance therefor. There was no removal of this material by the contractors, except where it lodged on the roadbed or was used by them as borrow in constructing the embankment. They were allowed for all the quantity of material in place within the prism of the railroad excavation. They employed neither powder nor pick, or other force, to bring down the slides. They came of their own momentum. The clear meaning of paragraph 5 is that, as in excavations, there might be outside thereof projections of rock or material dangerous to the road, it should be removed by the contractors, and that there might be material on the slopes which was loose or liable to fall, and the contractors would be required to remove that. But they neither removed the slides as projections nor otherwise in their natural position. If the contention of the contractors, that all this slide material should be paid for as solid rock, is correct, it would, by the same reason and law, follow that if the bluff had extended back 1000 feet, and after the roadbed was blasted out the superincumbent strata of rock, to the mountain summit, had broken loose, and 100,000 cubic yards thereof tumbled into the river, beyond the roadbed, and was never touched by pick or spade or hand of the contractors, they would be entitled to receive pay for it as solid rock in its original position.

Chief Justice Redfield, in Herrick v. Belknap's Estate, 27 Vt. 694, in discussing the question of classification of slides under a contract on a not dissimilar state of facts, said:

"The slide of 10,000 feet of earth into the river, which was allowed by the masters at $1,000 as earth excavation, seems to me manifestly not to come within any just idea of excavation under the contract. It does not seem to have been the result of any art or contrivance, like bringing a stream of water to bear upon the bank, which has been treated as a legitimate mode of excavation under similar contracts. But this slide, and others at this point, were altogether accidental, and neither expected nor desired. Neither did they come within the range of what was originally intended as the bed of the road. This slide, and numerous others near the same point, resulted from the breaking away of the bank from time to time, which rendered it necessary to carry the bed of the road further back into the hills. At the price to be paid for earth excavation, these slides, at this point, would, in all, amount probably to nearly $10,000. And where they fell into the roadbed, and were required to be again removed, the engineers uniformly estimated the removal. But where they fell at once into the river, from a point not originally, or until the convulsion, intended to have been excavated, there seems no reason why they should be estimated as excavation under the contract, even if the whole hill, from its very base, had been at once removed by an earthquake or a volcano. It seems to us the engineers did right in rejecting this claim; and, right or wrong, their decision, if fairly made, is conclusive upon the parties."

The difference in classification made by Reaugh, and followed by the master, in the estimation of this slide material, amounts to $25,228.16. Even this result was reached by entirely eliminating any earth material, diminishing the loose rock, and exaggerating the amount of solid rock. We are unable to understand how it was found that the material contained no loose earth and so little loose rock. Without contradiction from any direct testimony, the evidence of the engineers present on the work is that on the slopes were large quantities of earth, supporting a growth of large trees, undergrowth, and vegetation, with a large mixture throughout the strata of material constituting loose rock; and this was corroborated by other evidence. Mr. Reaugh necessarily based his conclusions on observation of the face of the wall on the slope. He never saw the surface of the bluff before the excavation. He could not, at the time he took his observations, make any approximate estimate of the amount of loose earth and loose rock. His total estimate of material exceeds the aggregate of the chief engineer by 12,832 cubic yards. Exactly how he reached this difference in quantity is not made apparent. As a general rule throughout the estimations along the line of the road there is little difference between the final estimates of the chief engineer, or the resident engineers, as to the quantity of materials, and that of the witness Reaugh. There was evidence on behalf of appellants that the jarring down of this slide was attributable in some degree to overcharging the shots made by the contractors, evidenced by the fact that it blew large quantities, in large bulk, across the river, and across a near-by creek, into adjoining fields, which became a matter of complaint by the owners of the farms; and this was corroborated to some extent by observations taken by experts, who afterwards examined the premises. One of the expert witnesses, who testified in behalf of appellants, stated that in his opinion the classification of the amount of solid rock and loose rock, made by the chief engineer, was too small; but at the same time he stated that it was more a matter of

conjecture, and not so reliable as that made by the engineers who were on the work and saw the material.

## Evidence of Fraud and Conspiracy.

The master did not specify in his report the particular acts evidencing fraud, oppression, or corrupt judgment on the part of the chief engineer. The learned counsel for appellees animadvert upon the prior statement claimed to have been made by the chief engineer in a letter written to one Dandridge. One Kavanaugh, a witness introduced by appellees, testified that Dandridge showed him a letter addressed to his firm, signed by Molitor, which contained the statement that "McCarthy & Reichardt have the contract, but they may be very sorry that they ever received it." He gave no date of this letter. Molitor testified that he did not write any letter to Dandridge, or to any member of his firm, after the contract was let to McCarthy & Reichardt. Dandridge testified that he was not in the city of Little Rock at the time and place testified to by Kavanaugh; that he had no conversation with Kavanaugh in regard to the contract; that he did have a casual conversation, in Frankfort, Ky., with Kavanaugh, in which Kavanaugh told him he heard of some complaint by the contractors, and that probably he told him he had rather expected that, because he thought the figures bid by all the contractors were too low; that he did not know Molitor personally, and that his recollection was that he did not show Kavanaugh any such letter, and felt sure he had no such letter in his possession. We submit that such testimony hardly warrants making it the basis of finding a hostile mind on the part of the chief engineer. It is true that the chief engineer did complain to the construction company of their action in awarding the contract to McCarthy & Reichardt at a higher figure than that of other bidders. This, it seems to us, should rather redound to the credit of the spirit of honesty and fairness of the chief engineer than to make it the basis of a motive for being dishonest in dealing with the contractors.

Appellees also put in evidence the deposition of one Knobel, who testified that down in the Indian Territory he had a conversation with Mr. Molitor regarding the location and construction of railroads in general; that during the conversation the witness remarked that as a rule railroad companies did not take sufficient time to find the best location to be had through the country, and when once located and built the necessary changes were very expensive work; that Molitor differed with him, and stated that he could make great savings to any railroad company in the construction of its road, no matter how it was located; that he asked Molitor how he could change the general result in the cost of construction after the final location was adopted, and profile and gradients approved, showing almost exactly the quantities of every piece of work under the contract; that Molitor asserted that there were a good many ways, not mentioning any particular one; that he said to Molitor the only way he knew of was in not returning full estimates for the work done, or failing to classify the work properly; that this ended the conversation. On cross-ex-

amination he testified that the conversation occurred in August, which was prior to the execution of this contract; that his acquaintance with Molitor was very casual, that he had only met him two or three times. Molitor testified that he had only met Knobel once in his life, in the early part of August, 1898; that he called to see him about taking charge of a locating party that they were sending out over what was known as the "Dutch Creek Route;" that the only conversation between him and Knobel on that day, or any other day, was the general directions that he gave him relative to the locations which he was to take charge of; that the statements made by Knobel were absolutely untrue; and that the statements attributed to him by Knobel were contrary to any professional opinion he had ever entertained concerning the location and construction of railroads. It seems incredible that Mr. Molitor would have made such statements with the sinister meaning imputed to a comparative stranger, and especially to a man who was about to take service under him. The recital by a witness of such loose conversation, necessarily giving his impression at so remote a period, and about a matter entirely disconnected from the contract in question, was of doubtful admissibility, and was not entitled to any consideration whatever by the master. Silsby Mfg. Co. v. Town of Chico (C. C.) 24 Fed. 893.

Special reliance for proof of a disposition on the part of the chief engineer to defraud and wrong the contractors is based upon the conduct of the chief engineer in the progress of the work in withholding from the contractors full monthly estimates, to entitle them to the 90 per cent. pay therefor. It may be conceded, as the facts turned out, as shown by the results of the final estimates, that the resident engineers and the chief engineer dealt illiberally with the contractors in the monthly allowances, especially in respect of the work where the slides occurred, and on what is known as the "Slayton Residency." As already stated, in the classification of materials at the slides for the first two or three months on the bluff work, the resident engineer, under the direction of the chief engineer, returned the whole amount as loose earth. This was done, as testified by the chief engineer and the resident engineer, because of the uncertainty in the mind of the engineer as to how that material should be classified, as the respective quantities could not be approximately ascertained until the excavation was done and the work cross-sectioned, intending to rectify the matter in the final estimates. The delay in respect of the proper monthly allowances on the Slayton residency the engineer accounts for on the ground that the first resident engineer on this work proved to be quite incompetent; that the confused condition of his notes kept of the work rendered it quite impossible for Slayton, who succeeded him, to make an approximate, reliable estimation, so that it was necessary to cross-section the work to bring order out of confusion. With detail Slayton explained the peculiar condition of the work on which he was engaged, and the difficulties with which he had to contend, preventing approximate estimates, as under ordinary normal conditions; that he had to cross-section at different times, as he had opportunity. He explained why it was that in the October, 1899, estimate, where the

largest discrepancy between the monthly and final estimate appeared, that he was unable to devote more time and attention thereto.

After all the denunciatory epithets heaped upon the chief engineer respecting this work, the analysis shown in tabulated form by counsel for appellants, presenting in detail the comparative estimates made by the chief engineer and the witness Reaugh, demonstrates little foundation therefor in fact. The analysis shows the following result:

Molitor's final estimate:

| | | |
|---|---|---|
| Earth | 17,643 | |
| Loose rock | 85,492 | |
| Solid rock | 71,942 | |
| Total quantities in cuts, per Molitor | | 175,077 |

Reaugh's estimate shows:

| | | |
|---|---|---|
| Earth | 6,627 | |
| Loose rock | 85,603 | |
| Solid rock | 83,885 | |
| Total quantities in cuts, per Reaugh | | 176,115 |
| Reaugh's excess | | 1,038 |

Total value cut quantities, per Reaugh ...........$79,441.50
Total value cut quantities, per Molitor ...........73,681.35

Reaugh's increase ...................... $ 5,760.35 (8 per cent.)

As thus shown, Mr. Reaugh, who did not see the work while being done, minimized the quantity of loose earth and increased the quantity of solid rock. It does seem to us that it is but fair to say that such a difference so reached is not sufficient foundation for a charge of fraud and corruption, even if it were conceded that Reaugh's figures are nearer correct than those of Molitor, when the law commands that every reasonable intendment shall be indulged in favor of the honest judgment of the umpire.

The contention of appellees is that the underlying purpose of the chief engineer in withholding the proper monthly classifications and allowances, was to so embarrass and burden the contractors with lack of funds during the progress of the work as to compel them to abandon the contract, and that, failing in this, he carried his animus into the final estimates. The gravamen of the cross-bill of complaint is that the final estimate of the chief engineer is wrong. If the final estimate had been satisfactory or just, no cause of action would exist, for the palpable reason that the contract provides that the monthly estimates shall in no wise be conclusive, but the same "and all of the particulars relating thereto, including quantity, quality, and price, shall be subject to revision and adjustment of the chief engineer of the company," and "the company shall not be liable for any errors or omissions in said approximate monthly estimates, nor for any loss or damage suffered by the contractor by reason of his having settled with his subcontractors on the faith thereof, or otherwise."

Possibly, during the progress of the work, had the resident engineer refused to make proper returns, the contractors might have resorted to the writ of mandamus against the engineer to compel proper action; or they might have been justified in abandoning the contract and suing for breach thereof. But when, as in this case, they elected to continue, their reliance for justice was in the righting of wrongs in

the final estimate. The cross-bill itself is framed on the theory that for the dereliction of the chief engineer in the matter of short monthly allowances the remedy is for damage as for breach of contract, and on this account they asked for $15,000 damages. The master made no finding or award on this claim, presumably because no such special damages were shown, or, which is more likely, because no sufficient data were or could be furnished for estimating such speculative damages under such contract.

At the hearing counsel for appellees animadverted upon the fact that on the bluff cuts nearest to Little Rock, where the chief engineer was located, he often saw this work during its progress, and must have known that inadequate monthly estimates of the work there done were being reported by the resident engineers, and that this showed improper conduct and an evil disposition towards the contractors. Then in the same argument the contention was made that the chief engineer, in making his final estimates, did not make sufficient inspection of the detailed work; that the time he occupied thereon warrants the conclusion that he depended upon the monthly estimates, and not upon personal knowledge and investigation. The two positions are hardly reconcilable. The testimony of the chief engineer, supported by a number of credible witnesses, is that he spent a great deal of time on the work along this line during its progress, more so than usual, and that with the knowledge that he had of the work and the examination he made his final examination was amply sufficient to give him all the information necessary.

There is no dispute in the case that on the final estimate made by the chief engineer there was a balance of $122,911.02 due the contractors, subject to liens thereon by their subcontractors. The master, in his final estimation, holds that in the aggregate it was over $100,000 less than it should have been. The total length of the line of construction was 168 miles, at an estimated cost of about $2,500,000, and the work of McCarthy & Reichardt amounted to over $834,000. Even such a discrepancy on such a large amount of work might afford little reason for vacating the award for fraud and oppression. But when, as shown by this discussion, Mr. Reaugh and the master, by misconstruction and misapplication of the plain provisions of the contract, improperly found in favor of the contractors for nearly 60 per cent. of the difference, the remaining margin, in view of all the evidence, hardly furnishes a basis for disturbing the chief engineer's award on the mere weight of evidence.

There is not a word of evidence presented in this record to support the charge made in the cross-bill of complaint that the failure of the engineer in making proper allowances on the monthly estimates was influenced by the fact that the construction company or the railroad company was short of sufficient funds to meet the payments, or that there was any such understanding between the engineers and the companies.

It is not unimportant, before closing this part of the discussion, to say that the appellees are hardly in position to justify their denunciation of Molitor and the resident engineer, Herring, who was engaged

on that part of the work which presents the principal controversy in this case. To make out a case they placed these engineers on the witness stand, who testified at great length; and appellees invoke much of their testimony when it suits their purpose. No rule of evidence is better settled than that a party cannot impeach his own witness. Courts of high authority have said that a party thus using a witness may not then purposely contradict him, as he may not approbate and then reprobate. While it may be conceded that the rule does not preclude the party from showing, by other witnesses, facts inconsistent with those testified to by the witness thus introduced by him, nor from insisting before the court or jury that they should consider all the evidence and adopt that of one or the other witnesses, yet, such a party cannot impugn the integrity of the witness he has so introduced, and upon whose testimony he relies in part. He "cannot be permitted by argument to say that the witness is unworthy of belief, or to destroy the effect of his testimony by argument which assumes that the witness is dishonest." Ashley v. Board, etc., 83 Fed. 534, 27 C. C. A. 589; Graves v. Davenport (D. C.) 50 Fed. 881; United States v. Budd, 144 U. S. 172, 12 Sup. Ct. 575, 36 L. Ed. 384.

The testimony of these witnesses, like that of any other witness, should rather be judged by its internal probability, its specific particularization, candor, and sensibleness. On the other hand, it is difficult for the unprejudiced mind to read this record without the impression that the testimony, the opinions, and deductions made by the expert witness Reaugh were deferred to and followed as if he were almost an infallible guide.

### Interest.

The master has allowed interest upon the whole sum found by him to be due to the contractors from the 11th day of July, 1903, the date of the decree, at 6 per centum per annum. Section 23 of the contract declares that:

"Before final settlement is made between the parties hereto for work done and materials furnished under this contract, and before any right of action shall accrue to the contractor against the company therefor, the said contractor shall furnish evidence satisfactory to the chief engineer of the company that the work covered by this contract is free and clear from all liens for labor or materials, and that no claim then exists against the same for which any lien could be enforced."

As the master has found that there were large amounts of outstanding claims against the contractors in favor of subcontractors, which are declared by the decree to be liens on the corpus of the railroad, it is contended that the suit on the cross-bill at least was prematurely brought, and that consequently no interest should be allowed on the balance admittedly due the contractors under the final award. At the hearing, when the foregoing paragraph of the contract was brought to the attention of the court, it was suggested to counsel that, if this view of the effect of paragraph 23 should be taken by the court, it might result in disposing of the whole case on appeal on that ground, without determining the merits; and inquiry was made of

counsel for appellants as to whether or not it was their wish that the court should take this course, and they were requested to file with the clerk a written expression of their position in respect of this matter. In compliance therewith they filed the following statement:

"If the court should determine (1) that the master's report should be set aside and (2) that this action was prematurely brought, the appellants consent, subject to all their legal rights in the matters of costs and interest growing out of the fact that the action was prematurely brought and the provisions of the contract as to the time when the alleged indebtedness should become due and the right of action therefor accrue, that the court may set aside the findings and report of the master, and consider and decide the issues arising in said cause on this appeal under the evidence contained in the record, the same as if it had been brought in apt time, and make all proper orders in reference to the matters of costs and interest in accordance with the legal rights of the parties as if this consent had not been made or given."

The sum of $122,911.02 is conceded by appellants to be due the contractors on the final award of the chief engineer. The aggregate amount of the sums found in favor of subcontractors is $30,043.88. The Circuit Court allowed interest on the balance found due from the date of entering its decree, July 11, 1903. Had the respondents below, on the entering of this decree, paid the said sum of $122,911.02 into court, subject to its order of distribution, according to the rights of the lienors, no interest could have been allowed thereafter; and as it has had the use of said balance during this appeal, we think it within the reasonable discretion of the court, under all the circumstances of this case, to allow the specified rate of interest on said balance from the 11th day of July, 1903.

It results that the decree of the Circuit Court in favor of the cross-complainants against appellants is reversed, and the cause remanded, with directions to the Circuit Court to set aside its decree approving the master's findings, and to enter a decree in favor of said appellees, McCarthy & Reichardt, in the sum of $122,911.02, with interest thereon at the rate of 6 per cent. per annum from the 11th day of July, 1903, declaring a lien upon the corpus of the railroad property for that sum, to be enforced by execution if not paid within 30 days after the entering of said decree; that out of the proceeds of said fund the other special liens found by the master and the court to be due and owing to the complainant and interveners be first paid; and to tax the costs of this proceeding against the appellees and appellants in the proportion of three-fourths to the appellees, McCarthy & Reichardt, and one-fourth to the appellants.

SANBORN, Circuit Judge (dissenting). The conclusions of the majority that the master erroneously disregarded the provision of the contract that "no classification whatever will be allowed in borrow pits, unless such borrow pits are selected and approved by the chief engineer," and that he classified a large amount of material as "hard pan" and loose rock which the chief engineer had the right in his discretion to designate loose earth, seem to me to be correct; but I am unable to assent to the other views expressed in the opinion or to the general result of the decision of the court.

The rule is that the award of an umpire is sustained by the presumption of his honesty and good faith, and that this presumption must prevail unless it is overcome by clear and convincing evidence of his fraudulent acts or intent in making his award, or of mistakes so gross that they imply bad faith. But in this case this presumption is met and overcome in this court by the equally persuasive presumption that the finding of the master and of the trial court that the estimates of the chief engineer were made in bad faith, with intent to defraud the contractors, was correct. Stearns-Roger Mfg. Co. v. Brown, 52 C. C. A. 559, 563, 114 Fed. 939, 943; Mann v. Bank, 86 Fed. 51, 53, 29 C. C. A. 547, 549; Trust Co. v. McClure, 78 Fed. 209, 210, 24 C. C. A. 64, 65. The evidence in this record has forced my mind to the conclusion, as it did the minds of the master and of the trial court, that the chief engineer intentionally estimated the amounts due the contractors much less than he knew they were entitled to receive, and that they ought to recover in this suit the amounts found by the master and the court below, less the increase which they allowed on account of the borrow pits. The case is, however, decided by the conclusions which the majority of the court have reached, and no digest or review of the evidence would be useful at this time. Suffice it to say that these facts, which are established by the record, persuade me that the chief engineer did not act in good faith:

It is conceded by the witnesses for all the parties that 90 to 95 per cent. of the slide material was originally solid rock in place, and the concession is also made that the material in the measured prism within the stakes was properly measured in excavation and allowed as solid rock, although a large portion of it was thrown over the precipice when blasts were fired and required no farther handling. The contract provided that:

"In rock excavations all projections toward the center line of track beyond the plane of the measured prism and all material on slopes loose or liable to fall shall be removed."

If the rock which slid from above the prism had remained overhanging and liable to fall, the contractors would have been required by this provision of the contract to blast it out and to remove it; and if they had done so they would have earned payment for rock measured in excavation. The natural interpretation of the provision appears to me to be that they were entitled to the same payment, although the rock slid from its place upon the removal of the prism. For a long time after large quantities of this rock had descended upon and beyond the prism the chief engineer refused to allow any estimates whatever on account of it, and for a still longer time he classified it as loose earth, and in his final estimate changed his classification to loose rock, but never allowed any substantial part of it as solid rock. Complaint was made to him as early as April that this slide material was not carried into pay quantities in the approximate estimates. He absolutely refused in that month to carry any part of it into these estimates, except a small portion in certain borrow pits which he designated. In other words, he refused to give to the contractors approximate estimates to

which they were clearly entitled on any basis of classification. In May, by his direction, his special deputy, Hogue, carefully examined this material, and reported that there were about 67,000 yards of it already down, and that there would be 13,000 yards more in a few days, while the resident engineers' estimate, which conditioned the amount to be received by the contractors, disclosed only about 20,000 yards. Nevertheless, the chief engineer, in the face of repeated complaints and of Hogue's report, made no correction of this estimate, but permitted it to stand unchanged through May, June, and July, so that this large quantity of material did not appear in the approximate estimates until August. In the month of May he directed his resident engineers to classify all slide material as loose earth, although he must have known that the percentage of loose earth in it was very small, and that it was nearly all either solid rock or loose rock. Indeed, according to his own final estimate, he held back from these contractors about $93,000 which they were entitled to receive on approximate estimates until his final estimate was completed. When he made his final estimate, he changed the classification of the slide material from loose earth, for which the contractors were entitled to receive 13 cents a cubic yard, to loose rock, for which they were entitled to receive 33 cents per cubic yard, but still refused to classify it as solid rock, for which they were entitled to receive 60 cents per cubic yard. The evidence is conclusive that the chief engineer knew that this slide material was not loose earth in April, May, and June. His instructions to his engineers, in the face of this knowledge, to carry this material as loose earth at 13 cents a yard, when he knew that it was either loose rock, worth 33 cents a yard, or solid rock, worth 60 cents a yard, was necessarily a great detriment to the contractors; and it is very persuasive evidence of the bad faith of the engineer.

There are many other facts which this record discloses that appear to me to point in the same direction. When all the facts which the evidence establishes are considered together, they seem to me inconsistent with the exercise of good faith by the engineer, and ample to sustain the finding of the master and of the court below that he intentionally reported the amounts due the contractors in both his approximate and final estimates much less than he knew they were entitled to receive; and this conclusion leads directly to the result that the findings of the master and of the court below should be sustained in all things, except in the allowance of the increase on account of the material taken from the borrow pits, which they gave under a mistaken view of the terms and effect of the contract in this regard.