## WALBRIDGE–ALDINGER CO. v. RUDD et al. *

(Circuit Court of Appeals, Eighth Circuit. July 14, 1924.)

No. 6633.

1. **Municipal corporations ☜354—Change in specifications of contract held not to justify rescission by contractor.**

A change in language of specifications for construction of water conduit for city from those first furnished a prospective bidder *held* not to effect any change in meaning to its disadvantage, which justified it in rescinding contract and abandoning work.

2. **Municipal corporations ☜354—Changes in work required by engineer's held not to justify rescission of contract by contractor.**

Under contract for construction of water conduit for city, which provided that contractor should bear losses resulting because nature of land was different from what was assumed or expected, and that engineers should have power to make changes deemed necessary and to decide as to meaning and intent of specifications and plans, a requirement by them that certain part of ditch, owing to character of ground, should be made wider, and that backfilling should be done in two operations instead of one, because of cracking of concrete conduit, *held* a proper exercise of their powers, and not to justify rescission of contract by contractor.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; R. L. Williams, Judge.

Suit in equity by the Walbridge-Aldinger Company against A. J. Rudd and others. From an order denying a motion for temporary injunction, plaintiff appeals. Affirmed.

Charles West, of Tulsa, Okl. (West & Petry, of Tulsa, Okl., on the brief), for appellant.

William F. Tucker and J. A. Duff, both of Tulsa, Okl. (W. B. Robinson, I. J. Underwood, Aby & Tucker, and Massingale & Duff, all of Tulsa, Okl., on the brief), for appellees.

Before SANBORN and LEWIS, Circuit Judges, and SCOTT, District Judge.

SCOTT, District Judge. An appeal from an order denying temporary writ to enjoin defendants from appropriating use of plaintiff's equipment in completing municipal contract. This is a suit in equity for the confirmation of a rescission of contract for

*Rehearing denied October 6, 1924.

construction of a water conduit line for alleged causes, for reformation of the contract as a basis for recovery of damages, and for the assessment of such damages. Injunctive relief is prayed in the bill, and in connection therewith application for preliminary injunction to prevent the city of Tulsa and its water commission from seizing and appropriating the use of plaintiff's equipment to complete the project upon plaintiff's cessation of operation.

Walbridge-Aldinger Company is a Michigan corporation, with place of business at Detroit. Messrs. Rudd, McCullough, Avery, Standeven, and Farmer compose the water commission of the city of Tulsa, Okl., and the city of Tulsa is an incorporated city in that state. It is alleged among other things in the bill that on September 5, 1922, the city of Tulsa, through its water commission, put forth a certain written statement of specifications for the construction of a water system in "blueprint" form as an advertisement or proposal for bids for the construction of a waterworks system, or portions thereof, the same separated into 11 proposed contracts, of which this case concerns 2, being contracts numbered 4 and 6. These contracts were for the construction of a conduit line from its proposed source at Spavinaw to the city of Tulsa, a distance of about 60 miles. The contracts included the clearing of right of way, excavating trench, manufacturing, distributing, and laying precast reinforced concrete pipe, and backfilling the trench. Contract No. 4 was for a 60-inch pipe from the dam at Spavinaw to station 14–16, an approximate distance of 28 miles; and contract No. 6 was for a 54-inch pipe from station 82x00 to the receiving well at Mohawk, an approximate distance of 24½ miles. The difference between 52½ miles and 60 miles is not explained, nor is it material.

Accompanying the specifications was a letter as follows: "We are to-day mailing you, by parcel post, complete set of specifications, and a set of plans which are complete, except for a few details. These will be furnished later. * * * We wish to call your attention to the note on page 2 of the specifications, relative to printed pamphlet to be furnished on September 15. Bids will be received on September 25 for this work, and we shall be pleased to have you present, and shall be glad to show you over the work at any time."

The note referred to is as follows: "Note.—A printed pamphlet containing the complete itemized list of contract drawings, instructions to bidders and requirements for bidding, proposal, forms of contract and bond, and the specifications will be ready for distribution on September 15th. All bids must be made on the proposal sheet contained in this pamphlet."

The bill alleges in substance that plaintiff familiarized itself with the specifications from the "blueprint," and prepared and submitted its bid, which was in due time accepted and resulted in closing the contract; that after putting out the "blueprint" defendants materially changed the specifications before embodying them in the printed pamphlet in final form; that these changes were not called to the attention of the plaintiff; and that the plaintiff, without knowledge thereof and being misled, closed the contract. The contract price was estimated to be about $4,000,000. Plaintiff sublet the making and laying of the concrete pipe to the Lock-Joint Pipe Company, and the ditching and backfilling to the Pitts-Bateman Company, reserving to itself the construction and operation of a railroad deemed necessary for conveying materials, and also reserved the financial profits and burdens.

The original and preliminary specifications were in "blueprint" and will be so referred to. The pamphlet containing the final form of specifications and contract was printed, and will be referred to as the "white print." The principal claimed material change in compiling the "white print" is the insertion of the word "these" before the word "dimensions" in a certain paragraph relating to excavation. It is alleged that the "blueprint" reads: *"Rock Excavation.* Rock shall be excavated to a width of 84 inches for the 60-inch pipe and 3 inches below the bottom of the outside of the pipe. Rock will be measured and paid for according to dimensions." In the "white print" the last sentence of the paragraph reads: "Rock will be measured and paid for according to these dimensions." The effect of this change, it is claimed, is to restrict payment to the specifications of dimensions immediately preceding, instead of permitting payment according to actual dimensions of rock excavation, which would exceed the specified dimensions preceding by reason of what is called "overbreak."

The plaintiff received the "blueprint" put forth by the defendants on September 5, 1922, and the advertisement requiring bids to be submitted on September 25th. On September 22d the "white print," embodying the completed contract and specifications, with all changes therein, was received by the

plaintiff. The plaintiff contends for a reformation of the contract by the elimination of the word "these" at the point stated, and for compensatory damages for breach of the contract in five different particulars:

(1) That defendants, after wrongfully inserting the word "these" in paragraph 2.3 of section 2 of contract No. 4, which was by reference also drawn into contract No. 6, limited their payments for solid rock to a dimension of 84 inches for the 60-inch pipe, and to 78 inches for the 54-inch pipe, instead of paying for actual dimensions as plaintiff contends the "blueprint" required. That this difference amounted to $100,030.

(2) That defendants, after wrongfully inserting the word "these" in paragraph 2.3 of section 2 of contract No. 4, which was by reference also drawn into contract No. 6, limited their payments for loose rock and shale to a dimension of 84 inches for the 60-inch pipe, and to 78 inches for the 54-inch pipe, instead of paying for actual dimensions as plaintiff contends the "blueprint" required. That this difference amounted to $27,428.

(3) That defendants' engineers wrongfully classed 94,077 cubic yards of loose rock, shale, or omitted classification as earth, and that this resulted in damaging plaintiff in the sum of $65,854.

(4) That after the work had progressed the pipe in soft earth settled and broke, and defendants' engineers required plaintiff to excavate the trench one foot wider in both contracts No. 4 and No. 6 than required in the specifications in order to afford room for proper tamping; that the amount of compensation so far as the work was in rock or shale has been included in the items above, but that said extra foot of work in earth amounts to $5,796.30.

(5) That the contract reasonably required that backfilling be done at one operation, but that after the pipe had broken defendants' engineers required the plaintiff to backfill to the extent of 1½ to 2 feet only, and then await the settling of such backfilling before completing the remainder; that this backfilling by two operations increased the cost to the plaintiff in the sum of $22,494.

On the hearing the plaintiff abandoned, for the purpose of the temporary application, its third contention relative to wrong classification. Therefore the matters really material to this appeal are the first and second contentions, which rest upon the alleged wrongful insertion of the word "these," and the fourth and fifth contentions, relative to the "extra foot" and dividing the operation of backfilling, both of which requirements were occasioned by the breaking of the pipe and the necessity for better tamping to prevent overloading the pipe until it had settled. Plaintiff does urge a secondary contention that on the face of the "white print" itself defendants breached the contract by restricting payment for rock on the 54-inch pipe to 76 inches in contract No. 6, instead of 84 inches as specified in paragraph 2.3, section 2, contract No. 4, drawn into contract No. 6 by reference.

As stated, the plaintiff submitted its bid on the 25th of September, 1922, and, plaintiff being the successful bidder, the contract in form of the "white print" was finally closed a few days later. The work began within a reasonable time thereafter and progressed smoothly for a time. About February, 1923, controversies arose between plaintiff and defendants' engineers relative to alleged misclassification of earth. About April, 1923, the cracking of the pipe occurred, and the increased width of trench, increased ramming of the pipe bed, and the dividing of the backfilling into two operations were required. The plaintiff alleges that it acceded to the requirements, understanding and believing that it would be compensated extra therefor; that continued negotiations were in progress between the plaintiff and its attorneys, and the defendants and their attorneys and engineers, until November, 1923; that on the 9th of November, 1923, the plaintiff learned definitely that the defendants would not pay for the extra foot of excavation; that thereupon plaintiff notified the defendants that it would not prosecute the work by digging the extra foot, but would stand upon the specifications as made, and would demand settlement in accordance therewith; that upon said demand being made defendants, on the 23d day of November, 1923, notified plaintiff that if it did not excavate the trench to the extra one foot that it would not be paid anything whatsoever, and would not be allowed to continue the work. Thereupon plaintiff and defendants entered into a stipulation by the terms of which they agreed to seek to adjust their disputes, and agreed in such case that no act of omission or of commission on the part of the plaintiff on or subsequent to the 9th day of November, conforming in whole or in part to the views of the water commission or its engineers, should be construed an abandonment or postponement or estoppel against the contentions that they were making, nor

in any proceeding thereafter had should the same be referred to or considered as such; that thereupon it was agreed that the defendants should advance monthly to the plaintiff a portion of the 15 per cent. holdback provided under the contract, and pay the same to plaintiff as advance upon its work in completing a railroad found necessary to the prosecution of the work, and make an allowance to plaintiff monthly in about the sum of $40,000; that defendants did in the months of November and December allow and pay the plaintiff the sum of about $75,000, but in the month of January, 1924, defendants failed to continue to make said $40,000 monthly advance out of said holdback. The record is meager as to this exact occurrence, but we infer that the payment was withheld because the parties were unable to agree upon their differences and the plaintiff had determined to rescind the contract. The stipulation was entered into November 23, 1923, two monthly payments had been made, and evidently some time prior to January 21, 1924, plaintiff had decided to rescind, as its bill was filed on that day.

It also appears from the record that the cost of completing the railroad had somewhat exceeded anticipation, that plaintiff was pressed for money, and that defendants voluntarily advanced plaintiff sums beyond the requirements of the contract, which, with the $75,000 just mentioned, aggregated about $191,000. Defendants having withheld the $40,000, which it is alleged they agreed to advance at the time of the January, 1924, estimate, and having declined to accede to the plaintiff's contention for the elimination of the word "these," or to allow plaintiff extra pay for the two operations in backfilling, or for the extra foot in width of excavation, plaintiff on January 24, 1924, notified defendants of its purpose to rescind the contract, and that it had sued for rescission, settlement, and for an injunction. Plaintiff also in its communication advised defendants that it had shut down work wherever safe to do so, and urged defendants to do what they wished in taking over for completion at least a portion of the work, and suggested its willingness to arrange for the temporary use by defendants of plaintiff's equipment.

Upon receipt of the foregoing communication, defendants' engineers certified to the water commission that plaintiff had abandoned the work and recommended the termination of the employment of the contractor and taking possession of the premises, work, and equipment of the contractor for the completion of the work under an option in article 21 of the contract. Thereupon on the same day the water commission met and resolved that the contractor be given written notice of the intention of the city of Tulsa, through its commission, to terminate the contract, and that on Monday, January 28, 1924, at 8 o'clock a. m., it would take possession of the premises, works, and equipment of the contractor on said works contemplated by contracts 4 and 6 of the Spavinaw water supply project, for the purpose on the part of the city of Tulsa, through its water commission, of completing the work contemplated by said contracts, and further resolving that the chairman of the water commission notify Fidelity & Deposit company of Maryland, surety on the bond of the plaintiff, of the abandonment of the work by plaintiff and the action of the water commission as contained in the resolution. Notice of this resolution was then given the plaintiff and its surety as provided.

In pursuance of the foregoing action the water commission took over the work including plaintiff's equipment against its will, of which purpose plaintiff had previously had informal notice, and had already filed its bill. On January 24, 1924, plaintiff gave notice of hearing on its application for temporary writ of injunction to take place on the same day, which hearing was for cause adjourned from time to time, and on the 6th day of February, 1924, finally heard and the application denied. It is from the order denying plaintiff's application for temporary writ that it prosecutes this appeal.

[1] We now come to the question whether in the circumstances plaintiff was entitled to declare a rescission of the contract, abandon the work, and invoke the jurisdiction of the court for the extraordinary remedy of a preliminary writ of injunction to enforce the withdrawal of its equipment. As stated, plaintiff contends for the affirmative of this question, first, upon the ground of alleged material change from the "blueprint" by the insertion of the word "these" in the "white print"; second, because of the decision of the engineers requiring the extra foot in width of the trench and backfilling by two operations, and their refusal to award extra compensation therefor; and, third, restriction of payment to 76 inches in rock on the 54-inch pipe. Counsel have devoted the great burden of the argument to the question of "overbreak" or the insertion of the word "these" in the "white print," and we are inclined to the view that this is the con-

trolling question on this appeal, for, assuming plaintiff's position to be well taken, and that the insertion was fraudulently made, and resulted in the serious consequences contended for, it might well be said, even in the face of the rigid provisions of the contract constituting the engineers umpires of practically all disputed questions, that plaintiff would have the right to immediately rescind. We take these questions up in the order stated.

Consideration of the effect of the insertion of the word "these" in the "white print" requires a fair analysis of contract No. 4, as it appears in the "blueprint." With this in mind we shall here set out at large the portions of the "blueprint" relevant to the subject, which are in the following language and form:

"Contract No. 4.
"60-Inch Conduit.
"General Description.

"Item 0.

"Sec. 0.1. *Work Included.* The work included under this contract is the furnishing of the labor, materials, tools, equipment, and all facilities necessary for the construction of a 60-inch concrete conduit line from the dam to Sta. 14–60, an approximate distance of twenty-eight (28) miles. The work consists of clearing the right of way, excavating the trench, manufacturing, distributing, and laying 60-inch precast, reinforced concrete pipe in the trench, joining the pipes, backfilling, and all other necessary operations incident to the construction of this conduit, according to the plans and specifications therefor.

"0.2. Items:
    "Item 1.   Clearing right of way.
    "Item 2.   Earth excavation.
    "Item 3.   Shale excavation.
    "Item 4.   Loose rock excavation.
    "Item 5.   Solid rock excavation.
            *       *       *       *

"Clearing Right of Way.
"Item 1.

"1.1 *Description.* The contractor shall clear and grub such areas along the right of way as may be necessary for distributing and laying the pipe, excavating the trench, and depositing the excavated materials, and such other areas as may be required by the engineers.

"1.2. *Cutting of Trees.* All trees, brush, etc., shall be cut off low enough not to interfere with the distribution of pipes and backfilling. The trees, brush, roots, etc., shall be burned or otherwise disposed of as the engineers may direct.

"1.3. *Payments.* The price bid per acre for clearing the right of way shall include all labor, tools, equipment, and expense necessary for clearing the right of way and disposing of the waste materials.

"Excavation.

"Items 2–5.

"2.1. *General.* Except where the pipe is supported on beams or piers, the ground shall be excavated in open trenches to the necessary depth and width. No tunneling will be allowed, except with the written permission of the engineers. The engineers shall have the right to limit the amount of trench which shall be opened at any time in advance of the completed conduit, and also the amount of trench left unfilled. All material excavated shall be placed so as to interfere as little as possible with public travel. Streets and roads must be kept open in every case possible. Exceptions are to be made only on written permit from the engineers.

"2.2. *Earth Excavation.* For earth excavation, the width of trench for the 60-inch pipe shall be not less than eighty (80) inches. Earth excavation will be measured and paid for on the basis of an 84-inch trench with vertical sides. Where sheeting is required, the above widths shall be secured inside the sheeting, no allowance being made for the thickness of sheeting in computing the yardage of earth excavation for payment. For trenches excavated entirely in earth, the actual depth of trench excavated from the surface of the ground on the center line of the trench to the bottom outside of the barrel of the pipe at any station, shall constitute the depth of trench at any station and shall be used in computing the yardage excavated. No solid rock, loose rock, or shale encountered will be measured, classified, or paid for as earth excavation.

"2.3. *Rock Excavation.* Rock shall be excavated to a width of 84 inches for the 60-inch pipe and 3 inches below the bottom of the outside of the pipe. Rock will be measured and paid for according to dimensions. In trench through rock excavation, the three (3) inch space below the bottom of the pipe shall be brought to the grade of the bottom outside of the pipe by use of sand or comparatively clean gravel, all of which material shall be thoroughly tamped to form a firm bed for the pipe. The furnishing and

placing and tamping of this material is to be included in the price per cubic yard bid for rock excavation under this contract.

"2.4. *Classification.* When shale, loose rock, or solid rock is encountered, the contractor must notify the engineers in ample time to allow them to make measurements of and classify the same. No excavation will be paid for as shale, loose rock, or solid rock excavation which has not been measured and classified by the engineers. All excavated material, except shale, which, when not frozen, in the opinion of the engineers requires blasting for its removal, and boulders of one-half (½) cubic yard and over in volume, shall be classified as solid rock. Material which can be loosened with a pick, but which for convenience or economy is loosened by blasting, shall not be classified as solid rock excavation. Rock existing in such shattered condition that, in the opinion of the engineers, it can be loosened with picks or bars, shall be termed loose rock.

"2.5. *Shale.* No distinction will be made between hard and soft shale in classifying shale for payment. The width or trench in shale shall conform to that specified for earth in section 2.2.

"2.6. *Lines and Grades.* Approximate grades are shown in general on the profile, but the exact lines and grades will be given by the engineers in the field, as provided for under section 5 of the general specifications. Although the profile shows straight lines connecting one grade point with another, vertical curves may be actually used.

"2.7. *Payment.* Payment under items 2 to 5, inclusive, shall be based on the width and depth of trench as specified in sections 2.2, 2.3, and 2.5 of this contract. The price bid per cubic yard for these items shall include all labor, materials, and expense incident to the making of all the excavations as specified."

It will be observed that the contract is topically outlined and divided into sections, which in turn are subdivided into items, which in turn when dealt with in detail are divided in paragraphs. The sections and items are marginally indicated by numerals. The paragraphs are marginally indicated by a numeral, a point and a numeral. Section 1, being a general description, is composed of one item and one paragraph only. Section 2 embraces 16 items, 5 of which we have set forth as germane to the discussion. In dealing with the items in detail, some of them are dealt with singly. In other instances when they relate to the same general

subject they are grouped. This latter plan is followed when dealing with items 2 to 5, section 2, as these items all relate to excavation.

The division of the contract dealing with excavation is given a general heading, thus:

"Excavation, Items 2–5."

The subject is then divided into seven paragraphs, marginally indicated thus: 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, and 2.7. It must be borne in mind that all of these paragraphs, 2.1 to 2.7, inclusive, relate to and are the equivalent of items 2 to 5, and that general expressions in some of these paragraphs apply to more than one item. With this precautionary suggestion in mind we take up the subject of rock excavation.

"2.3. *Rock Excavation.* Rock shall be excavated to a width of 84 inches for the 60-inch pipe and 3 inches below the bottom of the outside of the pipe. Rock will be measured and paid for according to dimensions. * * *"

Now, plaintiff's contention is that the last three quoted words, "according to dimensions," mean according to the actual dimensions of the excavation, and that by inserting the word "these" between the last two words, the expression was made to mean, according to the specified dimensions just previously stated. In this connection it is enlightening to consider paragraph 2.7. That paragraph is generally germane to all of the items 2 to 5, inclusive. The language of that paragraph is:

"Payment under items 2 to 5, inclusive, shall be based on the width and depth of trench as specified in sections 2.2, 2.3, and 2.5 of this contract. * * *"

It will be noted that this paragraph uses the expression "sections 2.2, 2.3, and 2.5." This is clearly an inadvertence, as there are no sections indicated by a numeral, a point, and a numeral. The reference is clearly to paragraphs 2.2, 2.3, and 2.5. Now, applying this to rock excavation, it would read: "Payment for rock excavation shall be based on the width and depth of trench as specified in paragraph 2.3." Now, it will be observed that this paragraph does not say according to "dimensions" specified in paragraphs 2.2, 2.3, and 2.5. If it did, it might be hypercritically urged that the reference resulted in no progress, as one might still equivocate whether reference was had to the general term "dimensions" there mentioned or the specific dimensions therein contained. But the paragraph particularizes; the language is, *"based on the width and depth of*

*trench as specified."* Now, what width is specified, what depth is specified, in paragraph 2.3? Manifestly, "a width of 84 inches," and "3 inches below the bottom of the outside of the pipe." Thus we see on the face of the "blueprint" no ambiguity whatever when paragraphs 2.3 and 2.7 are read together. We think that, when these paragraphs are fairly considered and construed, they meant the same before the insertion of the word "these" as they did afterwards, and that they indicated clearly a "pay line," to use counsel's expression.

Now, in taking up contract No. 6, as it deals with the subject of excavation, we find this language:

"Sec. 2. *Excavation.* Same as section 2 under contract No. 4, except that the following paragraph is substituted for paragraph 2.2 in that contract:

"For earth excavation, the width of trench for 54-inch pipe shall not be less than seventy-four (74) inches. Earth excavation will be measured and paid for on the basis of seventy-six (76) inch trench with vertical sides. Where sheeting is required, the above widths shall be secured inside the sheeting, no allowance being made for the thickness of sheeting in computing the yardage of earth excavation for payment. For trenches excavated entirely in earth, the actual depth of trench, excavated from the surface of the ground on the center line of the trench to the bottom outside of the barrel of the pipe at any station, shall constitute the depth of trench at any station and shall be used in computing the yardage excavated. No solid rock, loose rock, or shale encountered will be measured, classified, or paid for as earth excavation."

It will be observed that the form of section 2 under contract No. 4—that is, paragraphs 2.1 to 2.7, inclusive, with the exception of 2.2—is completely drawn into contract No. 6. So it follows that the provision and reference in paragraph 2.7 of contract No. 4 is read into contract No. 6, with the same results.

All the foregoing is upon the assumption that plaintiff did not take the precaution to read the "white print" carefully, and that the subject of the payment line was not brought to its attention. The undisputed evidence, however, shows that plaintiff had in its possession the "white print" for a number of days before it signed the same as its contract, and that it, on executing the contract, deliberately declared that it had "examined the site of the proposed works, and annexed form of contract and bond, the

specifications and the contract drawings therein referred to, and has read the "requirements for bidding and instructions to bidders, hereto attached, and that he will contract, in the form of the contract hereto annexed," etc. And, while there is dispute in the testimony, we are inclined to the opinion that the weight of the testimony indicates that the very subject of the dimensions specified being a "pay line" was brought to the attention of the plaintiff and discussed to such extent that the plaintiff ought to have been advised on that point.

[2] A consideration of the question of plaintiff's right to declare a rescission, because of the decision of the engineers requiring the extra foot in width of the trench and backfilling by two operations, requires careful analysis of certain provisions of the contract. The following provisions are found in the general sections of the specifications:

"Sec. 4. *Changes.* The engineers shall have the right of making changes in the line, grade, form, position, plan, dimensions, or material of the work herein contemplated, either before or after its construction has begun. * * * "

"Sec. 6. *Work to be Done in Accordance with Drawings and Directions.* The work, during its progress and at its completion, shall conform to the lines and grades given by the engineers, and shall be done in accordance with the drawings and specifications and directions given by them from time to time, subject to such modifications or additions as they shall determine to be necessary during the execution of the work, and in no case will any work in excess of such requirement be paid for."

"Article III. *Engineers' Powers and Duties.* The engineers shall give all orders and directions, contemplated under this contract and specifications, relative to the execution of the work. The engineers shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials, which are to be paid for under this contract, and shall decide all questions which may arise relative to the fulfillment on the part of the contractor of the provisions of this contract and said specifications, and their estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided, and in case any question shall arise between the parties hereto relative to said contract or specifications, the determinations or decision of the engineers shall be a condition precedent to the right of the contractor to receive any money

under this contract for anything affected in any manner or to any extent by such question.

"The engineers shall decide as to the meaning and intent of any portion of the specifications, and of any plans or drawings, where the same may be found obscure or be in dispute, and they shall have the right to correct any errors or omissions therein when such corrections are necessary to the proper fulfillment of the intention of said specifications, plans or drawings; the action of such correction to date from the time that the engineers give due notice thereof.

"And difference or conflicts which may arise between the contractor and other contractors with the city in regard to their work shall be adjusted and determined by the engineers."

"Article XV. *Contractor's Risk and Responsibility.* The performance of the contract and the work is at the risk of the contractor until the final acceptance thereof and payment therefor. He shall take all responsibility of the work, and shall bear all losses resulting to him on account of the amount or character of the work, or because the nature of the land in or on which the work is done is different from what is assumed or expected, or on account of the weather, floods, fire, windstorms, or other action of the elements, or any cause or causes whatsoever for which the city is not responsible. * * *"

"Article XXI. *Abandonment of the Work.* In case at any time the engineers shall be of the opinion and shall certify in writing to the commission, or the commission shall be of the opinion, that the work has been abandoned, or that the requirements of this contract as to the rate of progress have not been fulfilled, or that the contractor has neglected or refused to supply a sufficiency of properly skilled workmen or suitable equipment or materials of the proper quality, or has failed in any respect to prosecute the work with promptness or diligence, or has neglected to fulfill the requirements of the contract or is incompetent, after the commission gives notice in writing of its intention, at least forty-eight (48) hours before taking possession as hereinafter specified, to the contractor, if present on the work, or, if not then and there present, to a representative designated by him as aforesaid, the city may terminate the employment of the contractor and enter in and take possession of the premises and the works and the entire plant and equipment of the contractor, and may use the same to complete and may complete the specified work by day's work, by contract, or otherwise, purchasing any necessary materials therefor, or may require the surety hereunder to complete said work, at the option of the party of the first part; and in case of taking possession as aforesaid the contractor shall not receive any other payment under this contract until said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the city in finishing the work as aforesaid, the amount of the excess shall be paid to the contractor, but, if such expenses shall exceed the unpaid balance, the contractor shall pay the difference to the city."

The following provision is found in item 6 of contract No. 4, *Backfill*:

"6.1 *Description.* Loose dry earth, sand, or gravel, properly compacted with a hard rammer, shall be used to give the pipe a uniform solid bed for one-half of its perimeter. The utmost care shall be taken not to damage or disturb the pipe in filling the trenches. In completing the filling of the trenches above the aforesaid level, the earth may be replaced by the use of slips or similar devices. Where the top of the pipe when laid is below the original ground surface, all excess material remaining after the trenches have been backfilled shall in general be neatly rounded over the pipe. Wherever possible, at least one foot depth of earth backfill must be placed over the pipe. At places where directed, earth shall be scraped up along the right of way and filled over the pipe, in addition to backfilling the material excavated. * * *"

Preliminary to considering the application of the foregoing provisions of the contract, it is well to consider the cause which apparently induced the engineer to take the action and make the decisions involved in the controversy. We quote from the testimony of the witness Mitchell, general manager of the Lock-Joint Pipe Company, the subcontractor which laid the pipe: "When the work began the contractor constructed a ditch 76 inches wide (64-inch conduit). We got through the first section perhaps 1,500 feet through very shallow digging, we come to this gully. Past Mossy creek we ran into rough country, the water came in very near the surface of the ground, but we had very hard clay at the bottom of the ditch. The ditch was between 7 and 8 feet deep. The bottom of that ditch I examined, and it

was sufficiently firm to put this pipe on, making a good foundation. The backfilling —that ditch was so narrow it couldn't be backfilled with the material available, and it wasn't done. The dirt was taken by the steam shovel and put on top of the pipe. The work progressed until we got perhaps 250 feet or 300 feet further than that, when I was notified by one of our superintendents that the pipe in that stretch had cracked longitudinally and once circumferentially. I immediately went back into the pipe line. The inspector on the job notified the engineer, Mr. Holway, and Mr. Trammell. I went back in there and saw the damage, recognized at once the cause of those damages, came out of the pipe, and ordered my men to stop laying pipe until such provisions could be made by which that pipe could be backfilled properly."

There seems to be little dispute in the record as to the necessity for greater precaution in backfilling, nor that the necessity arose from the peculiar condition and formation of soil. Counsel for plaintiff in the brief, in attempting to attribute the cause to faulty specifications, in criticism of the engineer, says: "He is forced to adopt the fourth (that the specifications were faulty either as to width, depth or character of bed), because he is a weak, human creature in the employ of the city, and whose future depends on this line, not strong enough to confess his own mistake, adopt the fifth, which is the truth, and lay the blame where it truly belongs—to the uncertain, shifting, varying concomitants of an Oklahoma valley bottom. From the allegations of the bill one sees that the fifth, the inadequacy of specifications, is inescapable, especially when the uniform condition of Oklahoma valleys, shown in this case, is remembered—in one spot sandstone, next quicksand, next a few feet limestone, next clay, and so on. Of course, the rigid concrete, resting in the middle on a stone, in the end on quicksand, would buckle and break."

The engineers decided that the exigency required better tamping of the bed to the extent of one-half of the perimeter of the pipe. To do this in the circumstances required more room, and necessitated a widening of the trench 6 inches on each side. The engineers also decided that an alteration of the method of backfilling was necessary; that the pipe was being overloaded before settling, and that the operation of backfilling should be done at two operations, filling the ditch to the extent of about 1½ to 2 feet, then permitting a settling of the

pipe and the backfilling, and afterwards completing the backfilling. Plaintiff contends that these directions and changes were not within the limits of the contract as drawn. The engineers decided otherwise. In this connection the following clauses of the contract are enlightening:

"Sec. 4. The engineers shall have the right of making changes in the line, grade, form, position, plan, dimensions, or materials of the work herein contemplated, either before or after its construction has begun. * * *"

"Sec. 6. The work, during its progress and at its completion, shall conform to the lines and grades given by the engineers, and shall be done in accordance with the drawings and specifications and directions given by them from time to time, subject to such modifications or additions as they shall determine to be necessary during the execution of the work. * * *"

Article III, quoted supra, relative to engineers' powers is material, and particularly is article XV important to be considered. This article provides: "The performance of the contract and the work is at the risk of the contractor until the final acceptance thereof and payment therefor. He shall take all responsibility of the work, and shall bear all losses resulting to him on account of the amount or character of the work, *or because the nature of the land in or on which the work is done is different from what is assumed or expected.* * * *"

It seems to us that the clause italicized (the italics are ours) was designed to meet just such contingency as that now under discussion, and that the engineers were fully authorized to require the work to be done in the way they did. In this connection the provision of the second paragraph of article III should not be overlooked: "The engineers shall decide as to the meaning and intent of any portion of the specifications, and of any plans or drawings, where the same may be found obscure or be in dispute. * * *"

This court decided in Choctaw & M. R. Co. v. Newton, 140 Fed. 225, 71 C. C. A. 655, that a contractor for railroad construction work, who has voluntarily stipulated in the contract that the chief engineer of the railroad company shall act as umpire to finally decide all questions arising as to the construction of the contract, the nature and character of the work to be done and classification of materials excavated, and all other questions in respect to which there might be dispute or misunderstanding, could not im-

peach the decision of such engineer and recover an amount in excess of that shown thereby to be due, except upon a clear showing of fraud, or of such an arbitrary and wanton disregard of his plain rights as to be the equivalent of fraud and to show that, the umpire's action was consciously unjust. Certiorari was denied by the Supreme Court in this case. 202 U. S. 620, 26 Sup. Ct. 765, 50 L. Ed. 1174.

As we understand the argument of plaintiff's counsel, they contend that the instant case is on the record brought within the exception specified in Choctaw & M. R. Co. v. Newton, supra. A careful examination of the record on this appeal convinces us that the evidence does not support this contention. In these circumstances we hold that the plaintiff was not justified in attempting immediate rescission of, the contract and abandoning the work, either because of the insertion of the word "these" in the "white print" as stated, or because of the decision of the engineers requiring the extra foot of width of the trench and the double operation in backfilling.

There remains to be considered the question of the engineers' decision in restricting payment to 76 inches for excavation of rock on the 54-inch pipe line. By the terms of paragraph 2.3, items 2 to 5, section 2 of contract No. 4, which was by reference drawn into contract No. 6, the pay line was clearly specified at 84 inches for the 60-inch pipe, and no specific provision appears to have been made in the contract for reducing the pay line for 54-inch pipe. The engineers, in construing this feature of the contract, reduced the pay line from 84 to 76 inches to accord with the modification carried in the substituted paragraph in respect to earth excavation. Evidently the engineers determined that an omission or error had been made in the contract, which they were authorized by the second paragraph of article III of the contract to correct. We are inclined to the opinion that this was a correct conclusion, although we find it unnecessary to definitely so decide, as, in view of the advances made by the city beyond the requirements of the specifications, the plaintiff would not, in our opinion, be justified in declaring a rescission and abandoning the work on this ground only, nor do we understand from the record that the plaintiff so intended.

Upon consideration of the whole record we are satisfied that the District Court ruled correctly in denying the application for the temporary writ, and its order is affirmed.